# CHARLESTON.

HIETT *v.* SHULL.

Submitted February 4, 1892.—Decided April 16, 1892.

| 36 | 563 |
|---|---|
| 38 | 173 |
| 36 | 563 |
| 52 | 126 |
| 36 | 563 |
| 53 | 316 |
| 36 | 563 |
| e56 | 586 |

1. INSANITY—BURDEN OF PROOF—WILLS.
    The presumption of law is that all men are sane until the contrary appears; and the burden of proving insanity is upon the party alleging it, except in the case of wills.

2. INSANITY—SENILE DEMENTIA.
    Senile dementia is that form of insanity in the old marked by slowness and weakness, indicating the breaking down of the mental powers in advance of bodily decay.

3. INSANITY—SENILE DEMENTIA—EVIDENCE.
    The evidence of his neighbors of sound judgment and fair powers of observation, who have known him long and well, and who have had occasion to observe and test the vigor of his mental faculties, and who can give the facts upon which their impressions and opinions are based, is ordinarily the reliable evidence in such cases.

4. INSANITY—SENILE DEMENTIA.
    He must have reason, memory, and will enough to do the act in question freely and intelligently.

5. INSANITY—SENILE DEMENTIA—CANCELLATION OF NOTE—EQUITY·
    A court of equity has power to decree the delivery up and cancellation of a promissory note given by an old man who is clearly shown to be mentally incapable of transacting such business.

6. A case in which this doctrine is applied.

*R. W. Monroe* for plaintiff in error cited 25 Gratt. 865; 1 Jarm. Wills (1880) p. 93, n. B; 2 Bouv. Dict. 83, 627; 1 Bouv. Dict. 807; 19 Am. Rep. 598.

*Flournoy & Price* for defendant in error cited 94 U. S. 207; 11 W. Va. 584; 20 W. Va. 254; 23 W. Va. 579; 31 W. Va. 581; 9 W. Va. 327, 337; 2 Rand. 442.

HOLT, JUDGE :

This is a suit in equity, brought in the Circuit Court of Hampshire county, in July, 1888, by Charles N. Hiett,

committee of John Shaffer, against J. W. Shull, charging, in substance, that John Shaffer is an old man eighty four years of age, unable to act with any proper and prudent management of his affairs, not able on account of mental imbecility to transact the ordinary affairs of life, to understand their nature and effect, or to have or to exercise any will of his own in relation thereto;—that on the 10th day of April, 1888, and prior to plaintiff's appointment as committee defendant, John W. Shull, appeared at Shaffer's house and claimed to have been greatly injured in his reputation by a slanderous charge made against him by Shaffer in a certain bill of injunction of Shaffer against D. A. Dougherty, about a time-contract given by the former to the latter, and by threats and intimidation took advantage of Shaffer's imbecile and childish condition, and thereby extorted from him forty dollars in money, and obtained from him his note or bond for one hundred and sixty dollars, payable on demand, which Shull is threatening to collect by suit; that Shaffer was *non compos mentis*; that said money was obtained from his imbecile ward without consideration, and by threats, intimidation and fraud; and he prayed that defendant, Shull, be compelled to refund the money, and give up the bond or note.

Defendant answered, saying that Shaffer had made against him the false and malicious charge that a certain certificate of acknowledgment of Shaffer to a certain writing selling timber, which certificate was made by defendant as a notary public, was utterly and willfully false; that defendant did go to the home of John Shaffer, and stated to him the injury done, but with no threats or intimidation, other than that if Shaffer did not retract the charges made against his character, and pay him a reasonable sum of money, he would be compelled to bring suit against Shaffer to vindicate his character and secure damages; that Shaffer thereupon gave a written retraction of the charge and also paid defendant the sum of forty dollars in money, and executed his note for the sum of one hundred and sixty dollars, payable to the defendant, for the injury and damages sustained by him. Defendant admits Shaffer's old age, but denies his imbecility and his incapacity of attending to business. There was a general replication.

The depositions of many witnesses were taken on each side, and the cause coming on to be finally heard on 6th March, 1891, the chancellor being of opinion that the plaintiff had failed to make out his case dismissed his bill, with costs, from which decree plaintiff has obtained this appeal.

Our Code (Ed. 1891) p. 124, has, for the sake of brevity and convenience, expressly made the words "insane person" the generic term, including every one who is: (1) An "idiot"—a person destitute of ordinary intellectual powers from any cause, and dating from any time; but, in common use, a person without understanding from birth. (2) "Lunatic"—a person of any form of unsoundness of mind other than idiocy; mental derangement, with intermittent, strictly periodically intermittent, lucid intervals; (3) "Non compos," which embraces "idiot" and "lunatic;" (4) "Deranged," which embraces all except the natural born idiot. These are all frequently used interchangeably, one for the other, but the distinctions are not wholly unimportant; for by section 19, c. 58, Code, pp. 579, 584, passim, an "idiot" is not to be received in either hospital.

The committee of an insane person shall be entitled to the custody and control of his person when he resides in this State and is not confined in hospital or jail, shall take possession of his estate, and may sue or be sued in respect thereto (Code, c. 58, §§ 33–37); and where the insane person is a party himself, the court may appoint a guardian ad litem for him (Code, c. 125, § 13.)

On 1st May, 1888, plaintiff Charles N. Hiett was by the County Court of Hampshire county appointed the committee of John Shaffer, and as such committee had a right to sue, and need not make his insane ward a party.

The specific kind of insanity here set up to invalidate the note given to defendant, Shull, is the well-known kind, most aptly termed "senile dementia,"—mental imbecility from old age—as the point about which are gathered various causes and facts of derangement. By holding fast to this apt designation of a well-known and not uncommon species of insanity, we will be less likely to stray off into a maze of irrelevancies, especially as to the kinds and

methods of proof; for example, expert as compared with non-expert testimony.

Every man is presumed to be sane until the contrary is made to appear. But the burden of proof is on the proponent of a will of this State, and in some other States, because the right to devise comes by statute, and not as of common right under the common law, except so far as resulted from the doctrine of trusts as administered by courts of equity prior to 1540, the date of the first statute of wills, (of realty) viz: 32 Hen. VIII. c. 1. Our statute (Code, c. 77, § 1) says: "Every person not prohibited by the following section may dispose of any estate to which he is entitled at his death." Section 2: "No person of unsound mind or under the age of 21 years shall be capable of making a will." But this *prima facie* presumption of sanity arises, even in cases of wills, where the *factum* is regular. But the presumption of law is always in favor of sanity when a deed or other instrument is brought in question. See *Jarrett* v. *Jarrett*, 11 W. Va. 584, our leading case on the subject; *Anderson* v. *Cranmer*, Id. 562; *Nicholas* v. *Kershner*, 20 W. Va. 251; *Cunningham* v. *Hedrick*, 23 W. Va. 579; *Bererly* v. *Walden*, 20 Gratt. 147; *Tubbs's Adm'r* v. *Gist*, 6 Call 279; *Horner* v. *Marshall*, 5 Munf. 466; Busw. Ins. § 194 *et seq.*; 11 Amer. & Eng. Enc. Law, 105; 1 Jarm. Wills (1880) p. 34, notes; *Beverley's Case*, 4 Coke, 123; Ewell, Lead. Cas. p. 522 *et seq.*

Sixteen witnesses were examined in this case on behalf of plaintiff, and three on behalf of defendant, one expert and eighteen non-experts, but all give the facts and circumstances upon which their respective opinions are based. Mr. Shaffer is shown to be eighty four years of age, with various facts and circumstances tending to show senile dementia. The mere old age of the party whose capacity is in question is not, of itself, sufficient to show mental incapacity. It does not, in and of itself, even tend to overthrow the *prima facie* presumption that all men are sane. Yet it is the important nucleus about which the other facts and indications of senile dementia must be grouped.

Any one who has watched with care the trial of such an issue before a jury knows that expert testimony proper,

based on long hypothetical questions followed by still longer and sometimes still more hypothetical answers, as we often see it given in, is in a manner worthless, and only tends or seems to darken counsel, especially when the experts appear as antagonists on their respective sides of the issue.

It is to the opinions of the party's neighbors of common sense and fair powers of observation, who have known him long and well, together with the facts upon which they are based, we must look in order to reach any satisfactory conclusion or judgment on this question; and, if such neighbors and acquaintances happen also to be more or less experts, the weight of their testimony is often increased. But it is the facts which they give us, grouped around old age as a center, upon which we must, of necessity, base our opinion, as these non-expert neighbors base theirs. They may be, taken singly, as light as air, yet of great weight when coming together. To these the jury or the court must, according to certain well-established principles and rules, apply its own common sense and common knowledge of human nature and human affairs.

And so each case must, in large degree, stand upon its own bottom, and be determined by its own facts. There is no arbitrary standard or inflexible rule that can be applied. Had he sense and memory and will enough to do the thing done? which is only one form of putting the implied question we set out to solve. Then come the witnesses *pro* and *con*, who give us his age, appearance, habits, conversation, ways, conduct as compared with an earlier period in his life, when his sanity was beyond question, together with, such particular facts as their memory may serve them with upon which they base their opinion, and from which the state of the mind is to be inferred.

And, when all is said and done, how very meager and trivial a showing of facts are they able to give us as a reason of the faith that is in them, sometimes in cases in which the insanity of the party is almost beyond question. While again, when the question involves some old man of great eccentricity, what a long string they can give us of whimsical and senseless absurdities in conduct and conversation, when it is beyond all fair question that the old man has all

the sense and memory and will to drive a bargain, and conduct his own affairs to his own interest, that he ever had, or any one need have.

We begin, then, with the help of this testimony to compare John Shaffer with the ordinary sane man, but in the main to compare him with himself; this latter comparison being more trustworthy, because we are not bothered with difference of idiosyncrasies which give the tone of individuality to each.

" "In 1876 John Shaffer was a careful, painstaking, economical; and successful business man, not delegating the management of his affairs to others, but carefully seeing to them himself. Not only did he give a careful supervision to his own affairs, but managed, to a great extent, the affairs of his two brothers. He calculated his own notes and made his own investments. His firmness amounted almost to obstinacy, as was illustrated by his resistance to all demands of the Pownall heirs. These things I know of Mr. Shaffer personally. When I again became connected with him last spring, I found him developing into a kind of spendthrift, taking less and less care of his property, and becoming more and more a prey to unscrupulous parties; to any one who saw proper to attempt to overreach him. I found in him an almost utter loss of will power, and a susceptibility to influence beyond any man I have known. Furthermore, I testify, not as a matter of belief, but to a matter of fact, when I say that Shaffer is incapable of attending to his own business affairs; when I see a business baby in business affairs I recognize him without looking for him."

The above, is from the testimony of plaintiff, Hiett, the committee. He is then asked, on further cross-examination, to state his reasons specially for saying that John Shaffer is not competent to attend to his business affairs. Answer.

"*First*, because he can be persuaded to do things utterly detrimental to his own interests, as demonstrated by the note given to Dr. Taylor, by the payment to defendant, Shull, by the second contract with Dougherty, by his carelessness in allowing his notes to run out of date, as the note against James Nealice and others; *second*, by the fact that

he will accept anything told him as true, and act on the information; *third,* that he will lend money without taking obligations for it, as he did in the case of James E. Grapes and others; *fourth,* that he will give up a note upon a payment of a part of the principal, as in case of Alkire; *fifth,* that he is easily terrorized, as was illustrated a few days ago, when I wanted to search his chest for a paper; *sixth,* because, if he was ever so capable mentally, he is incapacitated physically. He has not been out of his yard for years, never wears shoes that I know of, and is so badly bent that he almost goes on all fours. He does nothing but eat and sleep, and laugh and cry;" together with many other circumstances coming under his observation, saying that "he does not regard him as crazy, but rather a child;" saying, among other things, in substance, that he regarded him so "deep in dotage," so easily influenced, so entirely without a will of his own, that he could not transact any business understandingly. He then gives some other facts as grounds for his opinion, saying, "The reasons are as plenty as blackberries."

Sixteen witnesses, including himself, were examined on behalf of plaintiff, including Dr. Taylor, an expert witness, who speaks from his personal knowledge of and acquaintance with John Shaffer, being the family physician, not of Shaffer, a bachelor, but of the family where he lives. After giving various facts, he states it as his opinion that "he is mentally imbecile; easily influenced;" that without undue influence he is capable of transacting ordinary business. He had known him for about fifteen years. The doctor states that Shaffer was not capable of transacting ordinary business. Says: "He could probably be influenced to do certain things, either by force or persuasion, that would be against his interests; or, in other words, I consider his mind imbecile from old age, I suppose. I do not think he is diseased in any way physically. He is like any old man would be, but I consider, without being influenced, that he is capable of transacting ordinary business affairs." As an illustration of this, he made an experiment with the old gentleman in getting Shaffer to give him a note for one hundred dollars, due one day after date, with-

out owing the doctor one cent. He produces the note, with a minute detail of the circumstances under which he induced Shaffer to execute it to him. It is hard to tell what the execution of the note is intended to illustrate. The doctor was sent to examine him as an expert. Whether he gives this transaction as an illustration of his "mental imbecility from old age," or of "his capacity to transact ordinary business without being influenced," he does not say. If expert testimony is such in the green, it is not hard to imagine what it is in the dry, with a brace of experts proper on their respective sides answering hypothetical questions.

Nine or ten of the above witnesses, nonexperts, have long known John Shaffer as neighbors, and give it as their decided opinion that he was, at the time of giving the Shull note, "not capable of transacting his own business." Each gives facts and circumstances of personal observation on which he bases his opinion. Four others, who knew him well, speak of particular instances of incapacity to transact business. They give many facts indicating mental imbecility, up to the point of incapacity to transact his ordinary business affairs, and with unmistakable certainty. Not one man who lives in or near Pleasant Valley, the home of John Shaffer and his brothers, opens his mouth in contradiction of these facts, or gives any other fact that does not sustain the opinions of his life-long neighbors based thereon.

Mrs. Sowers says that the defendant, when once at her house, "turned round and looked at me and my son, and said John Shaffer was not really fit to do business ; that he ought to put his business in some other person's hands;" that John Shaffer had become so childish that she had to watch him.

Defendant introduced himself and two others as witnesses, who give it as their opinion that John Shaffer is not imbecile, but has mind and will enough to transact his own business. They are not neighbors, but know him.

In one view, the strongest witness against the plaintiff is John Shaffer himself. "It is a well-settled rule of law that an insane person is competent to be a witness if he have

sufficient understanding to apprehend the obligation of an oath, to enable him to give a correct account of those matters relating to the issue, which he has seen or heard." 1 Greenl. Ev. § 365, cited by Busw. Ins. § 344; *Coleman* v. *Com.*, 25 Gratt. 865. Here, also, the question of competency is for the court, and the weight and credibility for the jury. John Shaffer is examined and cross examined at great length, giving his testimony in the form of a deposition. It shows a certain amount of memory and sense, but also shows many things in an artless, unsophisticated way, that speaks for his side as well as against it. It shows quite plainly that he was not aware that he had slandered Dr. Shull in his bill of injunction, and that he had no will power to resist any of the demands for reparation. He signed at once the retraction drawn by Dr. Shull, as full and as complete as the doctor saw fit to make it; paid the forty dollars in money ; and executed to him the note for one hundred and sixty dollars, due one day after date, for the residue of the two hundred dollars demanded, and, as Dr. Shull left the house, Shaffer wept like a child. If he had been at himself, that would be the end of the case. But the evidence as a whole, and read with the rest, none more so than his own, clearly shows that this old man, once well able to take care of himself, was now, under such circumstances as this case presents, in that pitiable state of human helplessness when the strong man's will is gone, and the mind of childhood, with its fitful gusts of tears and laughter, has returned.

The human mind (as well as the body) is fearfully and wonderfully made, and this exhibition sometimes made by a life long drawn out, as it draws down near the close, is not the least strange of the strange things of this dark and mysterious problem. We might suppose old age to be that part of life farthest removed from infancy, but here we see the circle of life closing in upon itself ending where it began.

No higher proof need be required that this note of the old man was the note of a child than his own artless narrative of what took place, supplemented by what others say about it, and about what followed. Dr. Shull felt indignant at a charge of making a false certificate of which he

felt himself wholly innocent, and in which I think he is borne
out by the whole tenor of this testimony ; but he carried
the matter too far with this helpless, imbecile old man,
whose will was so easily and unreasonably subordinated
to the will of another.    Young Mr. Dougherty had no
design to overreach John Shaffer in his first timber con-
tract, as this record plainly shows, though his contract was
unintentionally broader in language than it was meant to be
in fact.    It was the idle talk of those who take other peo-
ple's business so much to heart that started the trouble.

There is no question about a court of chancery having
jurisdiction of the subject-matter.    All the books so lay it
down, no matter how guardedly they may exercise it in the
instance.    Nor is it any answer to say that the common-law
courts can afford a remedy when suit is brought upon the
note.    On this branch of remedial justice there is a wide
interlock of jurisdiction.    Besides, John Shaffer's person
and property are now in the custody of a committee, which
is an additional reason for not turning him out of this court
to seek a halfway remedy elsewhere.    It is a plain case of
giving up to be cancelled, and the plaintiff is in his proper
forum.

The decree complained of must be reversed, and a decree
entered perpetuating the injunction to the collection of the
note for one hundred and sixty dollars given to defendant,
and that he be required to refund to plaintiff, as John
Shaffer's committee, the forty dollars with interest from the
10th day of April, 1888, till paid.

REVERSED.