# CHARLESTON.

| 36 | 757 |
| 38 | 157 |
| 36 | 757 |
| 49 | 97 |

## STATE v. MAIER.

Submitted Sept. 15, 1892.—Decided Oct. 1, 1892.

1. CONTINUANCE—CRIMINAL PROCEEDINGS.

Section 1, c. 159, Code 1891, prescribes that "when an indictment is found in the Circuit Court of any county against a person for a felony, the accused, if in custody or if he appear in the discharge of his recognizance or voluntarily, shall, unless good cause be shown for a continuance, be tried at the same term."

2. CONTINUANCE—REVERSAL—CRIMINAL PROCEEDINGS.

To justify a reversal by the appellate court upon the ground of refusing a continuance, such action of the inferior court must appear to be plainly erroneous.

3. INSANITY—EVIDENCE—EXPERT—CRIMINAL PROCEEDINGS.

On questions of insanity a witness who is not an expert is allowed to express his opinion, where he has personal knowledge of the facts on which his opinion is based.

4. INSANITY—EVIDENCE—EXPERT—CRIMINAL PROCEEDINGS.

On the direct examination the questions put to the expert must be framed hypothetically, unless there is no conflict of evidence as to the facts, or unless the expert is personally acquainted with them.

5. INSANITY—EVIDENCE—EXPERT—CRIMINAL PROCEEDINGS.

Where witnesses are examined by the State in rebuttal on the question of insanity, who have had transactions with the prisoner and have known him well for months and years immediately preceding the killing, it is not error to permit the State to ask such witnesses, whether or not they had ever observed anything about the prisoner, or in what he said or did, that indicated insanity.

6. INSANITY—MURDER—INSTRUCTIONS—CRIMINAL PROCEEDINGS.

The indictment following the form prescribed by the statute charged among other things, that the prisoner had "willfully and deliberately murdered the deceased, M. Maier." On the motion of the State the court gave the following instruction to the jury: "The court instructs the jury that, if they believe William Maier murdered Marie Maier, as charged in the indictment, and had at the time sufficient power of mind to distinguish between the right and wrong of such act, although they may believe he suffered from mental aberration as to other mat-

ters, the verdict ought to be 'Guilty.' Such instruction was not
erroneous.

7. NEW TRIAL.

>    A new trial, asked on the ground that the verdict is contrary
>    to the evidence, ought to be granted only in the case of plain de-
>    viation from right and justice.

Statement of the case by HOLT, JUDGE:

On the 23rd day of April, 1892, in the Circuit Court of
Ohio county, the prisoner, William Maier, was tried for the
murder of his wife, Marie Maier, found guilty of murder in
the first degree, and sentenced to be hanged. Various ex-
ceptions were taken by the prisoner to rulings of the court
upon which he has obtained this writ of error. The learned
judge, before whom the case was tried, on overruling the
prisoner's motion for a new trial, filed a written opinion, in
which he sets out, reviews, and discusses all the points of
exception to his rulings except the instructions given on
behalf of the State. The following is his opinion:

"1. It is claimed that the court erred in overruling the
prisoner's motion for a continuance. This motion was
based (*a*) on the prisoner's own affidavit, which states, in
substance, that when a boy about nine years of age he re-
ceived a violent blow upon his head, caused by a brick
falling from the second story of a house, which rendered
him totally unconscious for a long period of time, and from
the effects of which he has never fully recovered; that at
times the effects of said blow make him utterly incapable
of doing a rational act, especially when laboring under ex-
citement; that his father is crazy at times, and his grand-
father, on his father's side, was considered unsound, and
reputed to be mentally unbalanced; that the only witnes-
ses by whom he could prove these facts were his father,
John Maier, his mother, Kate Maier, Dr. Ocker, and others,
all who live in Aalen, Wurtemburg, Germany; and that, if
given until the next term of court, he could produce the
testimony of said witnesses; and (*b*) on the affidavits of his
counsel, to the effect that they had received information
(which the affidavit details) which rendered it proper that
a further and complete investigation into the prisoner's
sanity should be made; that sufficient time had not been

given them to prepare a proper defence for the prisoner; and 'that the crime with which said Maier is charged has caused intense excitement and consternation in this community, which excitement has not yet subsided, and renders it very improbable, in the nature of things, that a jury would at this time venture to render any verdict in opposition to such a defined and unanimous sentiment againt the accused.'

"Section 1 of chapter 159 of the Code provides : 'When an indictment is found in the Circuit Court of any county against a person for a felony, the accused, if in custody, * * shall, unless good cause be shown for a continuance, be tried at the same term. If any witness for the accused be a nonresident of the state, * * * the accused may present to the court in which the case is pending, or to the judge thereof in vacation, an affidavit showing such fact, and stating therein what he expects to prove by such witness, his name, residence, or place of service and employment, and, if such court or judge be of the opinion that the evidence of such witness, as stated in such affidavit, is necessary and material to the defence of the accused on his trial, an order may be made by such court or judge for the taking of the deposition of such witness,' *etc.* Hence the question arises, did the affidavits aforesaid show that the evidence of the prisoner's father, mother, and Dr. Ocker, or any of them, was necessary and material to his defence ?

"And, *first*, as to the blow the prisoner received in his childhood. He says in his affidavit that at times the effects of this blow make him utterly incapable of doing a rational act, especially when laboring under excitement; and that his father, mother, Dr. Ocker, and others, all of whom live in Germany, are the only witnesses by whom he can prove that fact. But, as the prisoner has lived in this country, and not in Germany, during the past eight years (as was disclosed in one of the affidavits filed in support of the motion for a continuance) the proof of that fact would be wholly unnecessary and immaterial to his defence, unless followed up by additional evidence showing that he had been affected in the same way, at times, during the past eight years, which additional evidence, according to his own

affidavit, he was unable to produce ; while the facts detailed in the affidavit of his counsel, which they claimed indicated mental unsoundness at times, were based solely upon hearsay, being unsupported by the affidavit of any witness who could testify to the truth thereof.

"*Second.* As to the insanity of the prisoner's father and grandfather. In *State* v. *Christmas*, 6 Jones (N. C.) 471, it was held : 'Where hereditary insanity is offered as an excuse for crime, it must appear that the kind of insanity proposed to be proven as existing in the prisoner is no temporary insanity, but that it is notorious, and of the same species with which other members of the family have been afflicted.' And in *Laros* v. *Com.*, 84 Pa. St. 200, it was held : 'A court is not bound to hear evidence of the insanity of a man's relatives   *   *   *   as grounds of a presumption of possible insanity, until some evidence has been given that the prisoner himself has shown signs of his own insanity.' Now, the prisoner in this case did not claim in his affidavit that his insanity was hereditary, but that it was the result of a blow received upon the head in childhood. Clearly, then, it seems to me that evidence of hereditary insanity was not necessary or material to his defence.

"*Third.* As to the claim that sufficient time was not given counsel in which to prepare a proper defence for the prisoner. The affidavit shows that they had five days, excluding Sunday, for such preparation. There were no intricate questions of law involved in the case. The prisoner had but one defence, and that was insanity. No one regretted more than the court its inability to postpone the trial until a later day in the term ; but, owing to the overcrowded condition of the docket, and the fact that the case of *State* v. *Garrison* had in February, 1892, been set for trial on the 25th day of April, 1892, and that the result of that trial and the length of time it would probably consume were involved in so much uncertainty, it did not seem possible to name a later day for this case, with any assurance of a trial, than April 20th. That the time allowed counsel, however, for preparing for trial was reasonable and amply sufficient for the purpose is shown conclusively (1) by the able defence they made for the prisoner, and (2)

by the fact that, although more than four weeks had elapsed betwen the conclusion of the trial and the argument of the motion for a new trial, not the slightest intimation was given upon such argument, by affidavit or otherwise, of the discovery of any additional evidence, or of any fact that would upon a second trial have a tendency to produce a different verdict.

"2. It is claimed that it was error to overrule the prisoner's motion for a continuance because of the excited condition of the community. That the community was not excited to such an extent as to deprive the prisoner of a fair and impartial trial is shown by the fact that twenty qualified jurors were obtained out of a panel of thirty nine.

"3. It is claimed that the prisoner's counsel should have been permitted to ask the medical experts the following question : 'Are not love and jealousy causes of insanity ?' A sufficient answer to this claim is that the question was not put in the hypothetical form. *McMechen* v. *McMechen*, 17 W. Va. 683; *Bowen* v. *City of Huntington*, 35 W. Va. 689 (14 S. E. Rep. 217.) It is true that there are two exceptions to the rule requiring such questions to be put in that form : (1) Where there is no conflict of evidence upon the material facts; (2) where the expert is personally acquainted with the material facts in the case. Rog. Exp. Test. 44. But this question did not come under either exception. While no witness contradicted the statement of the prisoner and of others that he loved his wife, yet his treatment of her, both prior and subsequent to their marriage and up to the commission of the murder, was before the jury, from which they might well have inferred that he never had any love for her; and it is not claimed that the experts had any personal knowledge upon the subject. And what is said with respect to this question applies with equal force to all of the other questions that the experts were not permitted to answer.

"4. As to the admission of evidence of the purchase of pennyrolal pills by the prisoner for his wife. This evidence was brought out by the prosecuting attorney on the cross-examination of the prisoner, and it seems to me that it was a proper and legitimate subject for such examination.

"5. It is claimed that the court erred in permitting the prosecuting attorney, on rebuttal, to ask the witness for the State what, if anything, they noticed about the prisoner that insanity. The right to ask this question is fully sustained by the ruling of the court in *Kerr* v. *Lunsford*, 31 W. Va. 659, 678 (8 S. E. Rep. 493.)

"6. The prisoner, in support of his motion for a new trial, files the affidavit of Edward F. Weichsel, to the effect that about two days before the trial commenced Jacob Keller, one of the jurors who tried the case, told him that if the prisoner was insane he should have been sent to the asylum before he had the opportunity to commit a cold-blooded murder; that it was as cold-blooded a murder as he had ever heard of, and that the prisoner ought to be hung for it. Keller files a counter affidavit, in which he says that he does not know Weichsel; that he has no recollection of ever having had any conversation wifh him, or with any one else, about the prisoner or this case; and that he was not in any way influenced in his verdict by any bias, prejudice, or opinion previously formed. On his *voir dire* Keller stated that he was not sensible of any bias or prejudice for or against the prisoner; that he had formed to some extent, but had not expressed, an opinion as to his guilt or innocence; and that, if sworn as a juror, he could discard that opinion, and be governed solely by the evidence that would be introduced before him. In *Smith's Case*, 7 Gratt. 593, Juror Ayres, on his *voir dire*, stated that he had formed a decided opinion that the prisoner was guilty, which still rested upon his mind, and was still fresh and decided; and Juror Royster stated 'that he had * * * made up a decided opinion from what he had read, and that the recollection of that impresson was still fresh upon his mind, and that he would, if evidence to the same effect should be given in court, and none other was introduced on the trial, find the prisoner guilty.' But as both these jurors were satisfied that they could discard their opinions, and give the prisoner a fair and impartial trial according to the law and evidence, they were held to be competent; and the ruling of the Virginia court with respect to these jurors was approved by the Snpreme Court of Ap-

peals of this State in *State* v. *Baker,* 33 W. Va. 319, 328, 329 (19 S. E. Rep. 639.) In *State* v. *McDonald,* 9 W. Va. 456, Juror Chamberlain stated on his *voir dire* that he had not made up or expressed any opinion as to the guilt or innocence of the prisoner; and that he had not been a member of the grand jury that found the indictment against the prisoner. After the conclusion of the trial, however it was discovered by the , prisoner's counsel that this juror had been a member of the grand jury that found the indictment and that he had voted for the finding. Yet the court refused to grant the prisoner a new trial on account of the misconduct of this juror, although no explanation whatever was made of such misconduct. In *State* v. *Greer,* 22 W. Va. 800, 820, which was an indictment for the murder of Robert G. Maguire, Juror Scarberry stated on his *voir dire* that he had not formed or expressed any opinion as to the guilt or innocence of the accused. Upon a motion to set aside a verdict of guilty of murder in the second degree which was rendered in that case, the prisoner filed affidavits, showing that this juror had on one occasion before the trial expressed the opinion that 'Greer ought to be hung for the murder' of Maguire; on another that he 'ought to be severely punished for killing' Maguire, and on still another that he 'ought to be sent to the penitentiary.' And the Court of Appeals held thatthe lower court did not err in refusing to set aside the verdict an account of the misconduct of this juror, although the affidavits filed by the prisoner were wholly uncontradicted.

These authorities show conclusively that, even if juror Keller had been guilty of the misconduct attributed to him,. which he denies, such misconduct would not justify the setting aside of the verdict. The other affidavits filed by the prisoner as to the misconduct of this particular juror relate to statements made by him after the trial had been concluded. In *Probst* v. *Braeunlich,* 24 W. Va. 356, the first point of the syllabus is as follows : 'It is settled in this State, as a general rule, with but few, if any, exceptions, that the testimony of jurors will not be received to impeach their verdict.' If the testimony of jurors, given under oath, will not be received to impeach their verdict, for a much stronger reason

the unsworn, ill-considered, and thoughtless statements of jurors, made to third persons should not be so received. "7. It is claimed that the verdict is contrary to the evidence, and that a new trial should be granted the prisoner for that reason. In *State* v. *Baker*, 33 W. Va. 339, (10 S. E. Rep. 639) the court says : 'A new trial asked on the ground that the verdict is contrary to the evidence, ought to be granted only in case of a plain deviation from right and justice, and not in a doubtful case, merely because the court, if on the jury, would have given a different verdict. Where a case has been fairly submitted to a jury, and a verdict fairly rendered, it ought not to be interfered with by the court, unless manifest wrong and injustice have been done, or unless the verdict is plainly not warranted by the evidence or facts proved.' This case has been fairly submitted to a jury, and a verdict, which it seems to me is clearly warranted by the evidence, has been fairly rendered. Under these circumstances, it is not within my power to set that verdict aside, and grant the prisoner a new trial. The motion must therefore be overruled."

*G. W. Atkinson* and *J. J. Coniff* for plaintiff in error cited the following authorities:

1.—*It was error to refuse the continuance asked by the defendant.*—9 Ga. 121; Thach. Crim. Cas. 516; 1 Head 49; 18 Ga. 467 ; 1 S. Rep. 421; 3 Am. Ency. 813; Const. Art. III s. 14; 25 Ia. 67; 7 Gray 71; 117 Mass. 148; 2 Va. Cas. 132; 2 Bach. 566; 31 Ind. 592; 17 Mich. 9 ; Code (1891) c. 159, s. 1; 17 Cal. 123; 16 Ind. 192; 11 W. Va. 726; 17 Gratt. 629.

2.—*It was error to refuse to let certain questions be answered by experts.*—Rog. Ex. Tes. 44; 20 Ohio 211, 224; 6 Kan. 46; 61 Ala. 16 ; 86 Pa. St. 344; 38 Ind. 143; 83 N. Y. 358, 366 ; 46 Mo. 224; 2 Lans. (N. Y.) 206; 14 S. E. Rep. 216.

3.—*The rejection of material testimony was error ; and prejudice to the defendant is presumed therefrom.*—14 W. Va. 227; 21 W. Va. 225; 31 W. Va. 669.

4.—*Non-professional witnesses are not permitted to express opinions as to the soundness of the mind of one charged with crime.*—42 N. Y. 282; 110 Mass. 477 ; 1 N. Y. 569; 55 N.

Y. 636 ; 36 N. Y. 276 ; 34 N. Y. 190 ; 12 N. Y. 358 ; 1 Allen 511 ; 14 S. E. Rep. 999 ; 1 Whar. Ev. § 513.

5.—*The test of right and wrong is not the proper criterion in determining the guilt of one, whose sanity is questioned.*—Jud. Arp. Insan. Ord. 427 ; Maud. Res. Ment. Dis. 198 ; 49 N. H. 399 ; Edm. 28 n. ; 31 Ind. 485 ; 25 Ia. 67 ; 2 Brews. 546 ; 43 Conn. 514 ; 19 Mich. 401 ; Whar. Ment. Unsound. & Psychs. Law § 120 ; Reyn. Test Insan. 38.

Attorney-General *Alfred Caldwell* for the State cited the following authorities.

1.—*To justify reversal on the ground that the refusal to continue was erroneous, the error must be a plain one.*—27 W. Va. s. 11 ; 11 W. Va. 703 ; 7 W. Va. 447 ; 27 W. Va. 32 ; 19 W. Va. 323 ; 1 W. Va. 145 ; 2 W. Va. 187.

2.—*The questions to experts were properly refused, where no hypothetical.*—75 Va. 875.

3.—*The questions propounded by the prosecuting attorney to the State's rebutting witnesses were legitimate and proper.*— Whar. Ev. (2d Ed.) § 451 and n. 1 ; 31 W. Va. 659 ; 62 Me. 369 ; 12 Mich. 459 ; 51 N. H. 104.

4.—*Instructions for the State are free from objections.*—20 W. Va. 713 ; 28 W. Va. 297.

5.—*The motion for a new trial was properly overruled.*—11 W. Va. 745 ; 9 W. Va. 456 ; 13 W. Va. 160 ; 22 W. Va. 802.

HOLT, JUDGE :

The evidence proves and tends to prove the following state of facts : The prisoner, William Maier, is twenty three or twenty four years old. Was born at Aalen, Wurtemburg, Germany. Has been in this country about eight years. When about seven or eight years old he was struck on the head by a falling brick, which made him unconscious for a few hours, and left a scar still visible. Lives in Wheeling, and is a baker by trade. Was married to his wife, Marie, in October, 1891. He had a veneral disease. They kept house in Wheeling. He seemed to be attached to his wife, but for some reason treated her with great harshness, and she threatened to leave him, and on the 5th

of April, the night of the murder, had packed up her things for that purpose. Told him that she couldn't live with him, and was going to leave him; and the prisoner said if she didn't live with him she shouldn't live with anybody. He would knock a hole in her head with a hatchet. This was on Sunday night.

Katie Yoho, a little sister of Mrs. Maier, eight years of age, was staying with them, and was present, and slept with Mrs. Maier on the night of the murder. Testimony of Katie Yoho is as follows: "Will be eight years old my next birthday. Have been in Wheeling about two weeks. Know William Maier. Knew his wife. She was my sister. She was living here in Wheeling before she died. I don't know just whereabouts. I was at her house the day before she died. The day before that I was at her house. I had been at her house about half a week before she was killed. I was there on Sunday and Saturday before she was killed. My sister was at home on Sunday. On Monday she was there at the house. She was over at Mrs. Nesbitt's. She went there Monday morning — Monday evening. She came back in about half an hour after she went over. · I do not know what time it was. All day Monday she was at her own house. She went over there a little before the sun went down Monday evening. She came back from Mrs. Nesbitt's before dark. I went after her. She did not come back with me, but came about fifteen minutes after I went over. Maier was over in his own house that evening. I was sleeping in the same room with Maier and his wife during the three or four days I was there. It was the back room; the good room; the room you go into after passing through the kitchen. I slept on the floor. There was no trouble between them during the three or four days I was there. I don't think anything occurred but what I have told. That evening, before my sister went to bed, she came over, and he locked the door, and wouldn't let her out. She wanted to go over to Aunt Jennie's for her dress, and Will locked the door, and would not let her out the door. She went back and sat down. Afterwards they went to bed. That is all I know till the shooting was done. I expect it was about nine o'clock when sister went to bed.

I went at the same time. I slept in bed with her that night. Will did not take off his clothes and go to bed too. He lay down on the bed with his clothes on. He did not take his shoes off. Sister had all her things put away, and did not want to tear them up to put them out, so she told me to get in the bed that night, and sleep with her. She slept next to the wall. Head of bed was towards west wall. Side was towards the south wall. There was room for a person to go between the bed and the wall. Sister slept on the side next the wall. There was no conversation between Will and sister after they went to bed. I was not in bed very long before I went to sleep. Was awakened during the night. When I woke up, Will was not in bed. He was down at the bake-shop. He had gone out. He came back about half an hour after he went out. He came into the bedroom. When he came, sister told him to go into the kitchen and make the fire. He went in there, and I guess he was making the fire, and had it all done except striking the match. He came back in, and she asked him if he had the fire made. He said: 'Yes, all but striking the match.' He went into the kitchen, and stayed a little while, and came back, and when he came back he shot. He asked her if she would kiss him, and she said, 'No;' she had a hard washing to do; that she would kiss him when she got up. He told her he would give her a half a minute to wake, and if she didn't kiss him it would be the last kissing she would ever do ; and then he shot. The revolver was in his right hand pocket. He held it in his right hand. When she saw the revolver she jumped up. When he pointed the revolver at her she jumped up, and pulled the clothes over her head. He pulled them off her head. She told him not to do that, and she would never give him another cross word. She said, 'Oh, Will, if you don't kill me, I will never give you another cross word;' and then he shot. When he shot she fell back, and said, 'Oh !' Then he shot at me. There was no light in the room when he fired that shot. He had a match in his hand when he was shooting. He struck the match after he fired the first shot. Held match in his left hand. He hit me in the hand. When he shot at me, I jumped and threw my hand up, and it hit me in

the hand. Then he ran, I guess, downstairs. I lay still till he got out. Then I jumped up and ran out to the porch, and I thought he was coming back, and I ran in and got under the bed. He didn't come back, so I went out and ran up to Aunt Jennie's. All that occurred in the house where William Maier lived, in Wheeling, Ohio county, West Virginia. There was a large butcher knife in the house, and sister put it in the fireplace that evening. She said she put it in the fireplace. There was no trouble about that knife as I know of.

Cross-examination by Mr. Atkinson : Lived at Woodsfield before coming to Wheeling. Shooting occurred on Tuesday morning, before daylight. There was no trouble between Will and sister that I heard while I was there. When Will returned from the bakery that Monday evening he remained in the house all evening. Did not go out anywhere. Will gave no reason for not taking his clothes off that night. There was no quarreling between them that night. Light had burnt out. Both lamps had burnt out—one in the kitchen and one in the bedroom. Went to bed in the dark. We all went to bed together. There was no light in the room that evening, as I know of. Could see any one distinctly in the room. The blind was up, and the window was hoisted. There was no light in the room at all that night, only when he shot he lighted two matches. It was dark when he fired the first shot. He lit the match after he fired the first shot. He was standing between the wall and the bed when he shot. I was awake at that time. I had been awake ever since he went out and came back. He had gone up about half an hour before the shooting. I saw him point the pistol at me. He told me he would kill me. My sister brought that butcher knife into the room. Will and I never had any quarrel. He never abused me, nor threatened me, at any time. Will had first gone out into the kitchen when I awoke. I could see the revolver, because it was just new and bright. Re-direct examination : There was sufficient light in the room to distinguish a person in the room. I didn't hear anything about her going to leave him, except once. She said she couldn't live with him, and she was going to leave him.

That is all she said, and on Sunday evening she packed all her things up. Sister said to Will that she couldn't live with him that evening before we went to bed. · Maier said if she didn't live with him she shouldn't live with anybody. He would knock a hole in her head with a hatchet. It was that Sunday." Katie Yoho recalled: "Will had on light clothes the Monday night he went down to the bakery—his working clothes. He and his wife were not talking pleasantly and agreeably before they went to bed that night."

The prisoner had previously bought a revolver, thirty eight calibre. It was found in the gutter of the street about a quarter after ten o'clock the day after the night Mrs. Maier was killed. The prisoner escaped, and was captured on the eighth day after the killing, was indicted and tried, as already mentioned.

Upon the question of insanity there is no claim that he was insane at the time of the trial, nor is there any evidence tending to prove insanity during the eight years previous to the killing, but the contrary. The prisoner was examined on his own behalf. Stated that he had never felt right since injured on the head by the falling of the brick. As to the killing, he says: "I know I shot, but don't know what I shot, don't' know when I shot, don't know where I was when I shot, don't know whom I shot."

Some fourteen or fifteen witnesses were examined on behalf of the prisoner. One said he thought the prisoner very peculiar; a man he would not want to offend or have for an enemy; thought he had a bad temper, but didn't think he was of unsound mind; but the witnesses who knew him pronounced him sane during the eight years covered by the testimony; also the many experts. Apart from the unnaturalness and enormity of killing his wife under the circumstances already stated, there is no evidence that he was insane except his own statement.

Error is assigned in refusing a continuance. The prisoner, in his affidavit for a continuance, does not give the grounds for his belief that the evidence of the witnesses mentioned as living in Germany can be procured, so that the court may see that the belief is not merely a hope, but

a well founded, reasonable expectation, that it will be procured.    See *State* v. *Harrison, supra* p. — (15 S. E. Rep. 982.)

We also know judicially that the term of such court could have lasted until the first Tuesday in June, 1892, but no further postponement was asked for by the prisoner. The accused had all the witnesses he appears to have desired summoned and examined; and, without opposing testimony, was himself examined as a witness as to all the matters mentioned in his affidavit as ground of continuance.

The statute evidently contemplates a trial to be had at some time during the term at which the indictment is found, for it says that the accused, if in custody, *etc.*, shall be tried at such term, unless good cause for a continuance be shown.    The trial court saw the accused, noted his manner and bearing, was well acquainted with its own docket, the order of business, and the time required for its disposition ; and, "though an appellate court will in this · State and in Virginia supervise the action of an inferior court on a motion for a continuance, it will not reverse a judgment or decree on that ground, unless such action was plainly erroneous, even if the case were a criminal case."    *Buster·* v. *Holland,* 27 W. Va. 510–534, citing *Hewitt* v. *Com.,* 17 Gratt. 627.    We can not say that the court below plainly erred in refusing to continue the cause.

Instruction No. 1, given on the motion of the State, is point 2 of the syllabus in *Robinson's Case,* 20 W. Va. 713, approved in *Douglass's Case,* 28 W. Va. 297, and, as it is not insisted in argument that it was error to give it, it need not be discussed.

The second instruction given on behalf of the State is as follows : "The court instructs the jury that if they believe William Maier murdered Marie Maier, as charged in the indictment, and had at the time sufficient power of mind to distinguish between the right and the wrong of such an act, although they may believe he suffered from mental aberration as to other matters, the verdict ought to be 'Guilty. '"

This instruction must be read with the charges in the statutory indictment interpolated, not as any abstract doctrine, but as applicable to the particular case which the evi-

dence proves or tends to prove. The criticism made upon this instruction is that the true test is power, not mere knowledge. Had the accused the power to distinguish right from wrong, and the power to adhere to the right and avoid the wrong? As we read the instruction, it in sub-stance comprehends this power of the will: If the jury believe William Maier willfully and deliberately murdered Marie Maier, and had at the time sufficient power of mind to distinguish between the right and the wrong of such an act. The terms "willfully" and "deliberately" necessarily imply a certain degree of will-power. For a full discussion of the subject, see *State* v. *Harrison, supra* p. 729 (15 S. E. Rep. 982.)

If there were any evidence in the case showing or tend-ing to show an irresistible insane impulse, as distinguished from the ordinary case of an impulse not resisted, that the killing was the direct result of the destruction by insanity of the power of self-control, then the counsel for the ac-cused should have called on the court for an instruction directed specially to that point. But there is no evidence showing or tending to show any such destruction of the power of self-control, or of insanity of any kind, other than the inference to be drawn from the unnaturalness and enormity of the act itself; nor is there any other evidence in the case tending to show want of any of the mental ele-ments of responsibility except the prisoner's own state-ment.

The subject is full of difficulty, and is supposed to be, and should be, confined to the facts of the particular case. If the examination of experts and instructions given are not confined to the case in hand, they would "extend over an almost unlimited field of inquiry, involving a discussion of the laws of insanity in all its complicated and mysterious phases. Their only effect would be to consume the time and attention of the court, and to mislead and confuse the mind of the jury with perplexing discussions upon the symptoms of the various forms of derangement as devel-oped in the human mind." STAPLES, Judge, in *Dejarnette's Case,* 75 Va. 875.

For a full discussion of the subject, see 2 Steph. Hist.

Crim. Law, pp. 124–185. The learned judge and writer closes the chapter on the subject as follows: "The importance of the whole discussion as to the precise terms in which the legal doctrine on this subject are to be stated may easily be exaggerated as long as the law is administered by juries. I do not believe it possible for a person who has not given long-sustained attention to the subject to enter into the various controversies which relate to it, and the result is that juries do not understand the summings up which aim at anything elaborate or novel. The impression made on my mind by hearing many—some most distinguished—judges sum up to juries in cases of insanity, by watching the juries to whom I have myself summed up on such occasions, is that they care very little for generalities. In my experience, they are usually reluctant to convict if they look upon the act itself as, upon the whole, a mad one, and to acquit if they think it was an ordinary crime. But their decision between madness and crime turns much more upon the particular circumstances of the case, and the common meaning of words, than upon the theories, legal or medical, which are put before them. It is questionable to me whether a more elaborate inquiry would produce more substantial justice."

We are of opinion that there are no errors in the rulings of the trial court, and that the judgment complained of should be affirmed.

AFFIRMED.