BOONE et al. v. EQUITABLE HOLDING CO. et al.

SAME v. BECKLEY NAT. BANK et al.

Nos. 3507, 3509.

District Court, S. D. West Virginia,
At Charleston.

April 4, 1940.

Connor Hall and Samuel Biern, both of Huntington, W. Va., and Leo Loeb, of Charleston, W. Va., for plaintiffs.

John Q. Hutchinson of Beckley, W. Va., and Frank N. Bacon, of Fayetteville, W. Va., for defendants.

McCLINTIC, District Judge.

This case was heard on an appeal by both plaintiffs and defendants from a Special Master's finding that J. A. Boone was competent to transact business up to January 1, 1929, but was so affected by senile dementia that he was incompetent to protect his interests from that date until his death.

J. A. Boone died in the Weston State Hospital for the insane of senile dementia in May, 1935, having been admitted there in June, 1933. The present plaintiffs are his two sons, John A. and William Boone. Mrs. Tola Boone, his wife, one of the original plaintiffs, died in 1936.

They seek to have certain notes, signed by J. A. Boone, for the most part as an accommodation endorser, between the years 1925 and 1929, judgments taken thereon and sales made thereunder, set aside, for the reason that Boone was incompetent to enter into a contract at the time the notes were signed by him, and no guardian ad litem was appointed for him during the trials when such judgments were taken.

The defendants are the parties in whose favor those judgments were rendered and the present holders of the properties and collateral securities formerly owned by Boone and sold to satisfy the beforementioned judgments.

The Special Master's finding was to the effect that Boone was competent at the time he signed the notes in question, but was incompetent to protect his interests when the judgments were taken thereon, except the two taken in favor of the Raleigh County Bank on September 11, 1928, and as no guardian ad litem had been appointed for him for the trial of those issues, all judgments except the two taken in 1928 must be set aside.

Numerous pages of testimony were taken for both plaintiffs and defendants. The evidence of the plaintiffs consisted of testimony of lay witnesses describing queer things that Boone had done from 1920 until he was sent to the asylum, and the testimony of three expert medical witnesses that, in their opinion, based upon a hypothetical question incorporating therein a resumé of the testimony of the lay witnesses, Boone was incompetent to transact business from 1923 until his death.

The defendants' evidence consisted of testimony of Boone's business associates in his laundry, the city council, various banks and law firms, of individuals who came in contact with Boone socially or incidently in a business way, and of his brothers, as to the apparent competence of Boone in carrying on his usual business activities up to and including 1931. Upon the facts thus adduced, a hypothetical question was propounded to two expert medical witnesses, who gave their opinions that Boone was competent until the latter part of 1931.

A very clear and concise summary of the testimony of the lay witnesses is included in the report of the Special Master, and this court will not enter into a discussion of that testimony. The expert witnesses all agree that in senile dementia

there are no remissions and no lucid intervals; that once a person becomes incompetent as a result of that disease, he never again becomes competent, though he may appear to be normal at times.

There is little variance in the testimony of these experts as to the symptoms and pathology of senile dementia, which discloses that there are three stages of dementia, the second and third stages being an accentuation of the preceding stage. The first stage is marked by restlessness, a change of personality, defective memory, a weakening of the will and reasoning power. This leads to reminiscence and confabulation, incapability of comprehending new conditions and disorientation, the inability to concentrate or apply a trend of thought connectedly and the repetition of statements and stories, a general depression of the mind, suspicions of those with whom he comes in contact, and a general loss of vigor, energy and emotional stability which results from a gradual degeneration of the brain cells and decrease in size and weight of the brain. Senile dementia is that form of insanity in the old marked by slowness and weakness, indicating the breaking-down of the mental powers in advance of bodily decay. Hiett v. Shull, 36 W.Va. 563, 15 S.E. 146.

The experts vary greatly, however, in explaining the alleged queer acts of Boone and in reaching a conclusion as to Boone's mental capacities. Dr. R. G. Van Tromp testified for the plaintiffs that Boone was admitted as a patient in the Weston State Hospital in June, 1933, and stayed there until his death in May, 1935; that there was no remission in his mental condition, but that there was a progressive deterioration until its culmination in his death. In answer to the plaintiffs' hypothetical question, he stated that, in his opinion, Boone was undoubtedly incompetent by 1923. However, he testified on cross-examination that if it were true that Mr. Boone had conceived and carried out the business deals with P. M. Snyder from 1926 to 1929, as outlined by defendants' witnesses, such would possibly indicate that Boone was competent at that time.

Dr. Edward F. Reaser stated that, assuming as true the statement of facts referred to as plaintiffs' hypothetical question, in his opinion Boone was incompetent in 1923. He testified that, although a person in the first stage of senile dementia may appear to be normal to the layman, he does not have the power of carrying in mind the various elements of an important business transaction. His opinion was that Boone was in the first stage of dementia in 1923, and by 1926 had reached the second stage, but that he was incompetent in 1923, and was becoming progressively worse thereafter. Upon cross-examination he testified that if Boone was in a state of alcoholism when these various incidents occurred, his (the witness') opinion wouldn't be worth anything. Upon being recalled, however, Dr. Reaser testified that all the statements in the hypothetical question, such as the personality change, the worry and discontent, Boone's reminiscing and failure to recognize people, could not be accounted for by the use of alcohol. He also said that people who have senile dementia are peculiarly influenced by moderate doses of alcohol.

Dr. A. A. Wilson testified that he examined Boone in June of 1933, and that Boone then was in a state of almost complete dilapidation. In answer to the plaintiffs' hypothetical question, his opinion was that Boone's incompetency "began around 1920, and by 1923, or 1924, he would consider him incompetent to carry on ordinary business deals which involved judgment, memory, and general mental functions."

In answer to defendants' hypothetical question, which contained a resumé of defendants' evidence, and also a short resumé of plaintiffs' testimony, Dr. J. E. King testified that, in his opinion, Boone was competent prior to January 1, 1931; that if Boone had had senile dementia in 1921, '22 or '23, it would have progressed so far by 1925 that almost everyone who came in contact with him would have known it; and that the conflict in the two sets of facts could be explained by alcoholism—that it was most likely the queer things Boone did were done while he was intoxicated. But on cross-examination he admitted that these queer actions might indicate senile dementia also. He said that he saw no evidence of senile dementia until the latter part of 1931, and that the intelligence manifested by Boone in his activities prior to that time refuted the idea of insanity.

Dr. R. G. Blackwelder, when presented with both sets of facts and asked to reconcile them, said that they both could not be true. The queer actions, as shown by plaintiffs' testimony, indicated that Boone was a senile dement in 1923, but had Boone had dementia at that time it would have

been apparent to everyone he came in contact with by 1925 or 1926, and he could not have carried on the business transactions testified to by defendants' witnesses after 1923. He stated that a senile dement's condition will become apparent to everyone in eighteen months to two years. He admitted that a great number of Boone's queer actions could be explained by intoxication, but not all of them, such as a personality change, not knowing members of his family, etc.—that such statements, indicating senile dementia, just couldn't be true without such condition being noticed by his business associates.

It is clear, from the statements of Drs. King and Blackwelder, that their opinions of Boone's sanity were based on the fact that Boone transacted a good deal of business in a sane manner during the time in question, not merely on the opinions of non-expert witnesses, as claimed by the plaintiffs, and will, therefore, bear as much weight as the testimony of plaintiffs' experts.

The expert testimony indicated that senile dementia may progress from three to fifteen years before it results in death, depending upon the individual and the care given him, but that the normal case results in death in four to seven years. It is uncontrovertible that Boone died of senile dementia in 1935 and that he was incompetent when admitted to the Weston State Hospital in 1933. The dementia undoubtedly set in sometime prior to 1933—it is claimed by the plaintiffs in 1923 and by the defendants not until the latter part of 1931.

■ It is not the province of this court to question all the testimony of the witnesses. The Special Master was better able to determine whether they were telling the truth. Unquestionably Boone did some queer things in the early twenties, but it must also be admitted that he transacted business in a manner hardly characteristic of an insane man up to 1929. Ordinarily the time of the execution of a contract is the critical point of time to be considered upon the inquiry as to the capacity of the person making a contract. Buckey v. Buckey, 38 W.Va. 168, 18 S.E. 383; Jarrett v. Jarrett, 11 W.Va. 584; Wade v. Sayre, 96 W.Va. 364, 123 S.E. 59. In the case at bar, however, no evidence was presented by either side concerning Boone's capacity at the time he signed any particular note in question, so the only practicable method of deciding whether Boone was competent at such times is to fix a date at which time he thereafter became incompetent. As the pathology of senile dementia is such that there are no remissions in the degenerative process, and once a person becomes incompetent as a result thereof, he never again becomes· competent, such a finding should be a fair solution, under the circumstances. It would be impossible for even a phychiatrist to determine at precisely what point a person becomes incompetent, so an attempt must be made to fix a time which, in view of all the evidence of both parties, considered as a whole, seems most likely to be the proper date. It would be of little value to discuss the decided cases, because an analysis of the cases cited indicates that in determining the question of whether a person is competent or incompetent, each case must rest upon the facts and surrounding circumstances of that case.

■ The plaintiffs' evidence consists, for the most part, of isolated acts purportedly done by Boone, leading the witnesses to believe that Boone was not in his right mind. These acts might all have been done by Boone—plaintiffs' evidence might all have been true. It would be onerous for this court to decide what testimony to believe and what not to believe. But a great part of that evidence, though consisting of actions which are symptoms of senile dementia, do not necessarily prove that Boone was demented at the time they occurred, particularly when equal weight is given to defendants' evidence. Most of those queer acts could be explained by the intoxication or eccentricities of Boone, as admitted by medical experts for both sides. Those experts also agree that certain parts of Boone's behavior, according to plaintiffs' evidence, were unexplainable by eccentricities or alcoholism, such as the personality change, not knowing members of his family, the worry and discontent and reminiscence. Those characteristics would seem to be due to a pathological change in Boone. However, these last mentioned behaviorisms are not enough in themselves to make him incompetent to contract. "A grantor in a deed may be extremely old, his understanding, memory, and mind enfeebled and weakened by age, and his action occasionally strange and eccentric, and he may not be able to transact many af-

fairs of life, yet if age has not rendered him imbecile, so that he does not know the nature and effect of the deed, this does not invalidate the deed. If he be capable, at the time, to know the nature, character, and effect of the particular act, that is sufficient to sustain it." Buckey v. Buckey, supra. The fact remains, if we are to give equal weight to defendants' evidence that we give to plaintiffs' evidence, that up until 1929 Boone conceived and executed business deals in a sane and businesslike manner. This fact, in the opinions of experts on both sides, indicates that Boone was not suffering from senile dementia at that time, despite his queer actions. So up to the point where it becomes apparent from the evidence that Boone could no longer carry on in his business in a proper manner, we are forced to the conclusion that he was competent to transact ordinary business, such as signing notes. A person is presumed to be sane until adjudged insane and the burden of proving insanity prior to that time naturally rests upon him relying upon such to avoid an otherwise legal obligation. Carrigan, Committee, v. Davis, 84 W.Va. 473, 100 S.E. 91; Hiett v. Shull, supra; 32 Corpus Juris 756, Section 560.

The opinions of the lay witnesses as to Boone's competence, even though based on facts, bear little weight with the court, for it is very conceivable that most people, scanning the past history of a man who has been adjudged insane for just such isolated acts, may, ten or more years later, let those queer acts so overshadow his normal actions that they become convinced the man was insane all along. The mere opinions of witnesses not experts are entitled to little or no regard unless based upon facts which give good reason for such opinions; and, if the facts are frivolous or unimportant, such opinions are of little weight. Farnsworth v. Noffsinger, 46 W. Va. 410, 412, 33 S.E. 246; Kerr v. Lunsford, 31 W.Va. 659, 661, 8 S.E. 493, 2 L.R.A. 668; Jarrett v. Jarrett, supra.

The courts of West Virginia have been rather reluctant to set aside instruments because of incompetency at the time they were executed unless the proof is thoroughly convincing. Nicholas v. Kershner, 20 W.Va. 251; Teter v. Teter, 59 W.Va. 449, 53 S.E. 779; Delaplain v. Grubb, 44 W.Va. 612, 30 S.E. 201, 67 Am.St.Rep. 788; Hale v. Cole, 31 W.Va. 576, 8 S.E. 516; Burkle v. Abraham, 112 W.Va. 257, 164 S.E.

150; Woodville v. Woodville, 63 W.Va. 286, 60 S.E. 140.

A Federal Court exercising jurisdiction over a case on the ground of diversity of citizenship must apply the state law as declared by the highest state court. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. Even if there is a well-established federal rule on the subject in question, that rule should yield to a definite, established state rule if the question is doubtful. Kuhn v. Fairmont Coal Company, 215 U.S. 349, 30 S.Ct. 140, 54 L.Ed. 228.

A considerable portion of defendants' testimony consists of opinion evidence of Boone's business, social, and professional acquaintances that Boone was not insane prior to 1929, based upon the fact that they had not seen him act any way but normal when they had come in contact with him. This is opinion evidence that could hardly be said to be based upon facts, unless it can be said to be a fact that a man did nothing queer at various times. Affirmative evidence of facts usually carries more weight than negative evidence unsupported by facts. However, it has been stated, and such statements are quite generally supported, that while witnesses who are not experts, should, when testifying that a person is insane, accompany their opinions with the facts upon which they are based, this is not necessary where they testify to the sanity of the party, as there may be no such abnormal facts to be stated. People v. Borgetto, 99 Mich. 336, 58 N.W. 328; State v. Price, 92 W.Va. 542, 115 S.E. 393; State v. Maier, 36 W.Va. 757, 15 S.E. 991; State v. Toney, 98 W.Va. 236, 127 S.E. 35; State v. Soper, 148 Mo. 217, 49 S.W. 1007; 22 Corpus Juris 607, § 700.

Disregarding for the moment, however, all such evidence of the defendants, we find undisputed factual evidence that up to 1929 Boone conducted himself quite sanely in a business way. The P. M. Snyder transaction, the fact that Boone carried on banking transactions running into hundreds of thousands of dollars (a great deal of which he did personally), his activities in the laundry and on the city council, all occurring between 1926 and 1929, refute the idea of incompetence even in the minds of plaintiffs' own experts.

It hardly seems possible that had Boone become so incompetent as to be unable to understand the nature and consequences of

his acts in 1923, that he could have even entered into such activities—and it is highly improbable that these many people with whom he constantly came in contact in business during the period from 1923 to 1929 would not have noticed anything unusual about him. The court feels somewhat the same as Dr. Blackwelder felt—the two sets of facts could not both have been true.

Certainly, in the face of such evidence the plaintiff has failed to carry the burden of establishing mental incompetency prior to 1929 that would permit the court to set aside these contracts.

Defendants introduced some evidence that Boone showed no signs of mental weakness until about a year before he was sent to Weston. However, that consisted almost entirely of negative opinion evidence. There is very little evidence of any activities on Boone's part in the line of business after 1928 or 1929 and some of defendants' witnesses, as well as plaintiffs' witnesses, testified that they noticed his mental weakness at that time. Pertaining to the year 1929 and thereafter, the plaintiffs' evidence tends to establish more and more strongly that Boone was unable to conduct himself properly even in the simpler activities of everyday life, that he had apparently lost all connection with reality and was seemingly living entirely in the past. All the symptoms of dementia in the stage that makes a person affected thereby incompetent to take care of his interests became apparent and there is no evidence of anything that Boone did thereafter, with the possible exception of his conduct during his suit against Captain Mosely, as testified to by Mr. Ritchie, to rebut the indications of incompetency.

Boone received the normal care accorded an old man in his condition. The natural course of senile dementia is said to run over a period of from four to seven years. Boone died of senile dementia in 1935, six years after 1929. Thus, sound reasoning and a logical application of the facts found in this case to the pathology of senile dementia places the approximate time when Boone became incompetent in the year 1929. There is some doubt as to whether he became incompetent at the beginning of 1929 or later in that year, but the Special Master fixed the date as January 1, 1929, and he was in a better position than the court is now to pass upon the weight to be given the testimony of the witnesses.

Therefore, the Master's Report will be confirmed in its entirety, fixing the date of Boone's incompetence as of January 1, 1929.