# CHARLESTON.

STATE *v.* BERTHA TONEY.

(No. 5087.)

Submitted May 7, 1924.   Decided February 24, 1925.

1. CRIMINAL LAW—*Trial Court's Finding as to Qualifications of Juror Not Interfered With Unless Clearly Against Evidence.*

Where the questions propounded by the trial court are sufficient to test a juror's ability to completely disregard anything he may have heard and read about the case, and to give the defendant a fair and impartial trial, and his answers are so unequivocal and satisfactory as to convince the trial judge of the juror's fairness and impartiality, it is the settled practice not to interfere with the court's finding, unless clearly against the evidence. (p. 240).

(Criminal Law, 17 C. J. § 3580.)

2.  SAME—*On Defense of Insanity it is Competent for State in Rebuttal to Show Opinion of Witnesses as to Mental Soundness; Witness May Give Opinion as to Insanity Without Detailing Conversations.*

.  Where one charged with crime defends upon the ground of insanity, or want of mental capacity to commit crime, it is competent for the State in rebuttal to show by persons who were well acquainted with the defendant, and had known her intimately for a considerable time, that they never observed anything indicating that the defendant was insane or that she was of low mentality, and to give their opinion that she was sane, and of ordinary mentality, without detailing all of the conversations they had with her or all of her conduct which they observed.  (p. 242.)

(Criminal Law, 16 C. J. § 1540.)

3.  SAME—*Refusal to Instruct on Point Already Sufficiently Covered by Other Correct Instructions Not Error.*

It is not error to refuse to instruct on a point already sufficiently covered by other correct instructions given in the case.  (p. 246.)

(Criminal Law, 16 C. J. § 2506.)

4.  HOMICIDE—*Finding of Dead Body Bearing Injuries Sufficient to Cause Death Sufficiently Shows Criminal Agency.*

Criminal agency is sufficiently shown where a dead body is found with injuries apparently sufficient to cause death, under circumstances which exclude inferences of accident or suicide.  (p. 248.)

(Homicide, 30 C. J. §531.)

5.  SAME—*Direct Evidence Is Not Essential to Prove Corpus Delicti; Corpus Delicti May Be Proved by Circumstantial Evidence.*

Direct evidence is not essential to prove the *corpus delicti* in any case.  It may be proved as any other fact may be proved which is essential to establish the guilt of the accused, namely, by circumstantial evidence which produces the full assurance of moral certainty on the subject.  (p. 248.)

(Homicide, 30 C. J. §531.)

(NOTE:  Parenthetical references by Editors, C. J.—Cyc.  Not part of syllabi.)

Error to Circuit Court, Fayette County.

Bertha Toney was convicted of voluntary manslaughter, and she brings error.

*Affirmed.*

*Dillon, Nuckolls & Mahan,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for the State.

WOODS, JUDGE:

The defendant was indicted jointly with her mother, father and brother for conspiring together to murder her infant child, and in pursuance of this conspiracy, the life of the child was taken. Electing to be tried separately, she was tried at the April term, 1923, of the Circuit Court of Fayette County, and convicted of murder in the second degree. The court, on motion of the defendant, set the verdict aside, for the reason stated on the record that some testimony upon the trial of the case was inadvertently taken in the absence of the defendant. Another trial was had at the July term, 1923, of said court, and resulted in her conviction of voluntary manslaughter. She moved for a new trial, which was refused, and was sentenced to four years in the penitentiary. From this judgment she appeals to this court.

The evidence shows that the defendant, a girl of nineteen years, gave birth to a child; that a few hours thereafter some small boys, in play, found a dead infant in a large concrete culvert under the road a few yards from defendant's home; that the child had a man's string tie, identified as having belonged to defendant's father, tightly drawn and knotted around its neck; and that it was wrapped in an old bed quilt and in a sack. A paper with the name of defendant's father thereon was also found in the sack. Some of the facts connecting the accused with the crime will be commented upon later in this opinion. The doctor who made the physical examination of the body testified that from the color of the face, the bulging eyeballs and the protrusion of the tongue, the child had lived after it was born, and that death was caused by constriction around its neck. There were some spots of blood on the comfort and also some tar. It was shown that the house in which the defendant lived with her father, had been only a few days before painted with tar, and that there was tar on the weeds in front of his home. The defendant pleaded not guilty, and interposed a defense of mental incapacity and insanity; two physicians under whose care she had been for ten days after the alleged murder, as well as Dr. Guthrie, an expert on mental diseases, testified

that in his opinion the defendant was a mental defective. In rebuttal, the State placed a number of witnesses on the stand, who after showing that they had known the defendant for years, and had had occasion to observe her actions and demeanor, stated that she was intelligent and showed no signs of low mentality; that they had never observed anything out of the ordinary wrong with her; and that she acted as other young folks of the community.

In the brief filed by her learned counsel there are four assignments of error. Each will be considered and disposed of in their order here.

The first attacks the validity of the jury. J. D. Kincaid, one of the petit jurors, on his *voir dire,* testified that he was not related to the defendant, had read an account of the occurrence in the Montgomery News, had formed or expressed no opinion as to defendant's guilt or innocence, was conscious of no bias or prejudice against her, and felt free to throw aside any of the impressions he may have formed by reason of having read and heard of the case, and could give the defendant a fair and impartial trial just as if he had never heard of it at all. In response to questions propounded by counsel for defendant, he stated that he probably might have formed some opinion in the beginning; having heard that there was a hung jury on the other trial that would put aside all opinion he might have had on the former occasion as to guilt or innocence. On being asked if he should learn that there was not a hung jury, would that change his opinion about it, and to which he replied that if he heard that there was not a hung jury he would not know anything about it, but if the jury gave a verdict of guilty he would feel that she was guilty. He was then asked if he had heard that the jury convicted the accused, would he assume the accused was guilty, and to which he replied that he would. If he had heard the jury had returned a verdict of guilty he would assume that the party was guilty. He was again interrogated by the court, replying that he lived at Kincaid, twelve or thirteen miles from Boncar, the place of the alleged offense; that he felt now that he could give the defendant a fair and impartial trial just as if he had never heard of the case, and

completely disregard anything he may have heard or read of it. Under the law the defendant is entitled to a panel of twenty jurors free from bias or prejudice, whose minds are in a condition to hear, consider and properly weigh the evidence as it is presented to them at the trial uninfluenced by what they have heard or read of the case before trial. *State* v. *Johnson,* 49 W. Va. 684. In the last cited case the juror on his *voir dire* disclosed the fact that he had read the papers at the time of the killing; that he thought that he had expressed an opinion which was likely a decided one; that he was still of the same opinion and if sworn as a juror in the case would go into the jury box with the same opinion, and he would have to hear some good evidence to change it. The court there held that when a juror on his *voir dire* admits that he has formed and expressed an opinion as to the guilt or innocence of the accused, and expresses any degree of doubt as to whether such previously formed opinion would affect his judgment in arriving at a proper verdict in the case, it is error to admit him to the panel. To the same effect, the *Schnelle Case,* 24 W. Va. 767, and *Hatfield's Case,* 48 W. Va. 561. These cases are relied upon by counsel for the defendant. An examination of each of these cases shows that the juror expressed doubt as to his ability to discard what he had heard and read of the case, and decide the case according to the law and the evidence. The courts have not succeeded in establishing any judicial test by which the question of the competency of a juror can be determined. No fixed and invariable rule can be laid down. *Robinson* v. *Commonwealth,* 104 Va. 888. The standard of Lord Mansfield was that a juror should be as white paper and judge of the issue merely as an abstract proposition upon the evidence produced before him. This has long since been discarded as impracticable. The trend of recent decisions is in the direction of limiting, rather than extending the disqualification of jurors by reason of mere opinion. To have the effect of disqualifying a venireman, his opinion must be substantial, and not a mere impression which will not interfere with his fairness. *Commonwealth* v. *McCue,* 103 Va. 870; *Rust* v. *Reid,* 124 Va. 1. His opinion must have been deliberate and decided in

order to disqualify him. *State* v. *Moneypenny,* 81 W. Va.
362. Reading accounts in newspapers does not disqualify.
Where the juror has previously expressed a decided opinion
but swears he has no bias and can decide according to the
evidence, it was held he was competent. *State* v. *Lutz,* 85
W. Va. 330. The objection that counsel make to the juror
under consideration in the instant case is that he stated that
had he heard that the jury found the defendant guilty on
the former trial he would believe her to be guilty. His an-
swer was not based upon the facts in the particular case
but upon the abstract proposition that the jury had found
her guilty. Having the impression that the former jury
disagreed, he was suddenly met with the question as to the
effect a verdict of guilty in the case would have upon his
mind. The bare language used by a juror in attempting to
describe his mental attitude, especially where he merely ac-
cepts a formula put before him by counsel—as in this case—
is very often an unsatisfactory basis for passing upon his
qualification. He not only experiences difficulty in making
intelligible to others with precision his own state of mind,
but is apt to be under a misapprehension as to the scope of
the question asked. *State* v. *Henson,* 105 Kan. 581. He had
stated in answer to a former question that a hung jury de-
cided nothing. The answer complained of merely amounted
to a rescission from this statement to the patent truth that
ordinarily the verdict of a jury deciding a person was guilty
would be taken by him at its face value. Not knowing the
facts on which they based their verdict he would have no
reason for saying that such person was not guilty. The ques-
tions propounded by the trial court tested juror Kincaid's
ability to completely disregard anything he may have heard
and read about the case and give to the defendant a fair and
impartial trial. His answers were so unequivocal and satis-
factory as to convince the trial judge of his fairness and im-
partiality. So much depends upon the manner of the juror
and his tone of voice and the opportunity of the trial judge
to see and know the juror, that it is the settled practice to
not interfere with his finding unless clearly against the evi-
dence. *Robinson* v. *Commonwealth, supra.* The trial judge

must decide the question not from isolated answers, but from the juror's whole examination, taking into consideration not only the form of his answers, but also his appearance and demeanor while testifying. *Wormeley* v. *Commonwealth,* 10 Gratt. 658. The appearance of the juror, his bearing, and manner, are often of great consequence in interpreting his answers, and for that reason in any doubtful case the decision of the trial court as to his eligibility must control. *State* v. *Stewart,* 85 Kan. 404. The fact that so large a share of responsibility in determining the question of a juror's eligibility rests upon the trial court is rightly regarded as a reason for the exercise of the greatest care by the appellate court before a reversal of such finding. In the present case we do not find that the rule referred to was extended beyond permissible limits. The record does not disclose that the juror Kincaid knew of the defendant's conviction at the former trial, until it was brought to his attention by an instruction given to the jury at the request of the defendant stating that she had been convicted for second degree murder; that they would not be authorized to find her guilty of a higher degree; that they were to try the case made in this trial; and that *much* of the evidence introduced on this trial had not been heard by the jury on the former trial. Considering the apparent open mind of the juror as shown by his *voir dire* examination and this specific instruction of the court, we cannot say that the defendant was in the least prejudiced by his presence on the panel.

The next assignment of error goes to the admissibility of certain evidence which the court permitted to go to the jury on behalf of the State. To a proper consideration of this point a brief statement of the testimony offered on behalf of the defendant, to which the evidence complained of was a reply, is necessary. To sustain the defense on the grounds of mental incapacity to commit the crime charged and insanity three physicians testified in the case. This testimony went largely to her mentality. One expert on mental diseases testified that her mental capacity in his opinion corresponded to that of a normal person of the age of twelve years. Her father, mother and brother testified that she had ''spells''

during which she was incapable of knowing what she was doing, and at rational periods she had a low grade of mentality. One or two neighbors gave evidence to the same effect. To meet this issue a number of witnesses, who had testified in chief for the State, were called on rebuttal, and permitted to testify against the objection of the defendant, in respect to the conduct and demeanor of the accused. It is contended that these witnesses, who were not experts, were incompetent to testify, but if so, their testimony was not based upon a legal foundation therefor. The courts are not uniform in their holdings upon the admissibility of evidence of non-experts. The rule is well fixed that non-experts having favorable opportunities for ascertaining by observation, the facts, may testify as to their opinion respecting the sanity or insanity of another. *State* v. *Bryant,* 93 Mo. 273; *Jamison* v. *People,* 145 Ill. 357; *Reed* v. *State,* 62 Miss. 405; *Commonwealth* v. *Gerade,* 145 Pa. 289. Where a person has had adequate opportunity to observe the conduct or appearance of the person to whom insanity is imputed and whose judgment is based upon personal observation of his appearance, habits, manner and conduct, he is a competent witness. *Taylor* v. *United States,* 7 App. D. C. 27. In line with the foregoing decisions, this court has held that persons well acquainted with a defendant, may testify that they never observed anything indicating that he was insane, and give their opinion that he was sane without detailing all the conversations they had with him or all of his conduct which they observed. *State* v. *Price,* 92 W. Va. 542. By the same reasoning a like rule would apply where irresponsibility is relied upon as a defense.

Testing the challenged evidence of the State in the light of the foregoing rule what do we find? All of the witnesses, offered on rebuttal, had testified in chief for the State. They were neighbors of the Toney family and had known the defendant from childhood. They had been on intimate terms with the Toney family. For instance, Mrs. Thomas, lived only about 150 yards from their home, was the owner of a store in Boncar, and Bertha had often been to this store as a customer. The following question an answer is assigned as error:

"Q. Tell what her conduct and her actions were
when you heard her talk?

A. She would come to our house and store and
sometimes she would purchase goods. And she was
nice and intelligent at my place. She talked as
sensibly as anybody."

Alpha Martin was another neighbor of long standing of
the Toney family. Only two houses separated the two homes.
Bertha had been at her home "lots of times." She came in
and out of her home with Mrs. Martin's daughter, who was
about Bertha's age—only from June to January difference in
their ages. The following question and answer is assigned as
error:

"Q. How did she act when she would be at your
house?

A. All right. I never noticed anything wrong
with the child."

W. O. Caldwell had worked in a company store at Boncar
for three years. He had known Bertha Toney all that time.
She came into the store for her mail almost every day. Then
follows the question and answer assigned as error:

"Q. How did her conduct compare with other per-
sons of ordinary intelligence?

A. Miss Bertha and the folks with whom she as-
sociated were practically no different. I would say,
no different. Just like young folks would be, and
they mixed together as any other young folks do mix
in places of that kind."

Emma Buster had lived at Boncar for thirty years, and
had known Bertha Toney ever since she was a child. She
saw her at church and Sunday school often. In fact, Bertha
was a member of the same Sunday school class as this wit-
ness. The following question and answer is assigned as
error:

"Q. How did her conduct and demeanor—how
did it compare with the conduct of an ordinary per-
son?

A. A person of ordinary intelligence."

O. N. Mays is a minister, and lived within two hundred yards of the Toney home for twenty-three years. He has known Bertha since childhood. She attended a singing school taught by him for three terms. He saw her often at Sunday school and at church. She sometimes played the organ in Sunday school and sang in the church choir most of the time. He took her home from the children's day service, the day that she had a "spell" as testified to by a witness for the defendant. The following question and answer is assigned as error:

> "Q. Did you observe her conduct with reference to anything unusual or out of the ordinary? In other words, how did her conduct compare with the conduct of a person of ordinary intelligence?
> A. Her intelligence seemed as good as other people who came to the singing school and church."

The questions and answers objected to are set out *in extenso*. It will be observed that in each instance, before the opinion of the witness was expressed, the facts and circumstances upon which the opinions were formed were detailed. The evidence was in rebuttal of the evidence, some of it non-expert, offered by the defendant, which sought to establish the fact that she was incapable of committing the crime laid at her door—that she was irresponsible. The character and quality of the defendant's mind, as to whether it was weak or strong, is a material fact in a prosecution for homicide in which the defense is insanity. *People* v. *Worthington,* 105 Cal. 166. A non-expert may state negatively that he did not observe anything peculiar about the mental condition of the person whose insanity is in question. *Robinson* v. *Adams,* 62 Me. 369, 16 Amer. Rep. 473. A witness in a criminal case who testified that she had known defendant for two years and that she lived near her and had frequently seen her at work sufficiently qualifies herself to give her opinion as to the defendant's sanity or insanity. *State* v. *Sage,* 91 Ind. 141; *People* v. *Sanford,* 43 Cal. 29. In *State* v. *Price,* *supra,* Judge MEREDITH said: "When the question of mental capacity of one is involved opinions of non-expert witnesses who are well acquainted with him are competent. These

opinions are based upon conduct contrary to that ordinarily attributable to one possessed of his faculties under similar circumstances, and not upon conduct which is attributable to sane persons. If the witness had observed conduct and heard conversations from the alleged insane party inconsistent with conduct ordinarily attributable to persons of sound mind, he is allowed to say that he believed that the party was insane and give that as his reason. If, on the other hand, he has been well acquainted with the subject of the inquiry, and has observed no conduct which would indicate a deranged mind, he is permitted to testify to that effect.'' That was the holding of this court in the case of *State* v. *Maier,* 36 W. Va. 757. The last two cases establish the rule on this question in this jurisdiction. Whether the opinions of the accused in a criminal prosecution were based upon sufficient observation to entitle the witness to testify, is addressed to the sound discretion of the trial judge. It seems to us that the trial judge was careful and alert in guarding the interest of the defendant in keeping this evidence, of which the defendant complains, within proper bounds.

The next assignment or error relates to the instructions given in the case. Instruction No. 1, for the State, defining conspiracy, is complained of. Counsel for defendant admits that it is a correct definition but a mere abstract proposition of law and without evidence to support it. While there may be slight or no evidence adduced attempting to show conspiracy, yet inasmuch as the indictment charged conspiracy, defendant could not have been prejudiced by it. If anything this definition of the term, if there is no evidence to support it, as claimed by counsel for defendant, would tend to cast a greater burden upon the State to convict the defendant. Instruction No. 4, requested by defendant, was refused by the court. This instruction substantially tells the jury that if they believe that there is no eye witness to the homicide, and that the State relies upon circumstantial evidence to convict the defendant, the burden is on the State to prove the homicide by circumstances sufficient to convince the jury to a moral certainty of her guilt. The court's refusal to give

this instruction was based on the fact that it is a repetition of instructions Nos. 2 and 3. They are:

> Instruction No. 2—"The court further instructs the jury that since the State in this case relies for conviction upon evidence in whole or in part circumstantial, that it is essential that the circumstances should, to a moral certainty actually exclude every hypothesis but the one proposed to be proved, and that unless they do to a moral certainty exclude every hypothesis but the one proposed to be proved, then they should find the defendant not guilty."

> Instruction No. 3—"The court further instructs the jury that circumstantial evidence means proving a thing by circumstances, that is to say, after certain circumstances have been proved that the jury might, if they were satisfied that such circumstances were proved, conclude that a certain result followed, and if· in this case you believe that some essential part of the State's case depends upon circumstantial evidence, then it is essential that the circumstances should, to a moral certainty, convince you that they establish the fact essential to be proved, and unless you do believe such circumstances establish to a moral certainty the essential fact to be proved, then such fact would fail of proof and the defendant would be entitled to the benefit thereof."

These instructions amply justify the action of the court in overruling Instruction No. 4.

Instruction No. 7, offered by defendant and refused by the court, tells the jury that in the absence of a conspiracy, before a conviction could be had it would be necessary for the State to prove beyond a reasonable doubt that the defendant committed the alleged homicide with her own hands. The substance of this request is embraced in defendant's instructions No. 11 and 13. In No. 11 the jury is told that if the State has not proved that anyone saw the acts which are alleged to have produced the death of the infant child, and no eye witness has been produced that has established the homicide by direct evidence, then they are instructed that the circumstances proved by the State must be such, when all considered together sufficiently strong to convince them

beyond all reasonable doubt that the child was born alive
and that its death was the result of the intentional criminal
acts of the defendant. Instruction No. 13 likewise tells the
jury that unless they believe from the evidence beyond all
reasonable doubt that the infant child was born alive and
that its life was taken by some person or persons, and that
the said defendant was the person who took the life of said
infant, or was present aiding and abetting in the commission
of the offense with which she is charged, it is their sworn
duty as jurors to acquit her. It is not error to refuse to in-
struct on a point already sufficiently covered by other cor-
rect instructions given in the case.

The last error assigned is that the evidence was insuf-
ficient to warrant the verdict. The evidence shows that the
infant was killed by strangulation; the physician at the in-
quest and on the trial testified to this effect. He stated that
the child was cyanotic, or blue, in the face, and the rest of
the body a normal white. This condition was on account of
the impaired venous return circulation from the head to
the heart, the stagnation of the venous blood, causing the
blueness. There was bulging of the eyeballs, and protrusion
of the tongue, which would not have occurred had the con-
striction been placed around the neck after the death of the
infant. Criminal agency is sufficiently shown where a dead
body is found with injuries apparently sufficient to cause
death, under circumstances which exclude inferences of acci-
dent or suicide. In a case of this kind whether the child was
born alive is a question of fact to be determined from the cir-
cumstances. 2 Wharton Crim. Ev. Sec. 325 d, 327. Direct
evidence is not essential to prove the *corpus delicti* in any
case. It may be proved as any other fact may be proved
which is essential to establish the guilt of the accused, namely,
by circumstantial evidence which produces "the full assur-
ance of moral certainty" on the subject. *State* v. *Flanagan,*
26 W. Va. 116; *Cochran* v. *Commonwealth,* 122 Va. 801. It
is in evidence that she was actually present at the time of
the discovery of the dead infant in the culvert. This was
within a few yards of the defendant's home. The jury would
be warranted in inferring that she observed the boys play-

ing about the culvert and went to them for the purpose of enticing them away from that point. If not, why endeavor to send them to a town a short distance away to carry a note that was as yet unwritten? When the boys called her attention to something in the sack, she replied that it must be "spoiled meat." This was Sunday afternoon. The defendant was examined by two physicians at the hospital in Montgomery, on the following morning. According to their statements the defendant had given birth to a child not more than thirty-six hours prior to such examination. The placenta was still in the uterus. This fixes the birth of the infant the night before or early on the morning of the day that the body was found in the culvert. The finding of the body, so near to the home of the defendant, its birth being shown to have been but a few hours before, the tie around the infant's neck, identified as having belonged to the father of defendant, the newspaper containing the name of the defendant's father being around it, the tar on the sack in which the body was enclosed, the fact that the roof of the home of the defendant had been recently painted with tar, as well as the conduct of the defendant heretofore delineated are some of the facts and circumstances tending to connect the defendant with the crime. The testimony of divers neighbors who saw her practically every day fully established the fact of her delicate condition. In the face of this the father and mother testified that they knew nothing of this condition of their daughter, and that although she was at home the night and morning of the day that the physicians testify that the daughter undoubtedly gave birth to a child, they had no knowledge of the fact. The apparent improbability of their lack of knowledge of this fact, would tend to discredit their testimony in the eyes of the jury on other material points in the case. The defendant did not testify. The question of the capacity to commit, and responsibility for, the crime was fully developed and placed before the jury on behalf of the defendant. These were questions that belonged to the jury to decide. Two juries of the vicinage determined the issue against her. Without going into a minute detail of the evidence, the court feels that it would not be warranted in disturbing the verdict of the jury appealed from. In concluding this opinion, we will

say that the gravity of the offense, the circumstances surrounding the case, and the earnestness and ability with which counsel for the defendant have pressed their points upon the court, have led us to examine the record with great care. The testimony given, as well as every point made and authority cited, has been considered with anxious attention which the consequences of a conviction means for this unfortunate girl; but we are forced to the conclusion that the case has been well and fairly tried, and that no errors have been committed as would justify a reversal of the conviction. We therefore affirm the judgment of the Circuit Court.

*Affirmed.*