# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2014 Term

_____

No. 12-0887

_____

**FILED**

**April 10, 2014**

**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent**

**v.**

**CLINTON DOUGLAS SKEENS,**
**Defendant Below, Petitioner**

_____

**Appeal from the Circuit Court of Wayne County**
**The Honorable Darrell Pratt, Judge**
**Criminal Case No. 11-F-060**

**AFFIRMED**

_____

**Submitted: March 25, 2014**
**Filed: April 10, 2014**

**Lori M. P. Waller, Esq.**                          **Patrick Morrisey**
**Deputy Public Defender**                          **Attorney General**
**Gregory L. Ayers, Esq.**                            **Benjamin F. Yancey, III**
**Deputy Public Defender**                          **Assistant Attorney General**
**Kanawha County Public Defender's Office**    **Charleston, West Virginia**
**Charleston, West Virginia**                       **Counsel for the Respondent**
**Counsel for the Petitioner**

**The Opinion of the Court was delivered *PER CURIAM*.**

**SYLLABUS BY THE COURT**

1. "The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982)." Syl. pt. 1, *State v. Jones*, 174 W.Va. 700, 329 S.E.2d 65 (1985).

2. "The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense." Syl. pt. 3, *State v. Joseph*, 214 W.Va. 525, 590 S.E.2d 718 (2003).

3. "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. pt. 1, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996).

4. "To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests upon defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." Syl. pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).

5. "One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syl. pt. 3, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

***Per Curiam***:

This case is before this Court upon the appeal of Clinton Douglas Skeens ("Skeens") from his conviction in the Circuit Court of Wayne County of murder of the first degree, without a recommendation of mercy. The evidence before the jury established that the victim, Jess Scott Jarrell, ("Jarrell") died from multiple stab wounds resulting from an unprovoked attack carried out by Skeens at Jarrell's home. Decades before, Jarrell had been Skeens's football coach at Wayne High School. Skeens acknowledged at trial that no animosity had existed between him and Jarrell and that Jarrell had always treated him with respect.

Skeens was sentenced to the penitentiary for a term of life, without the possibility of parole. Thereafter, the circuit court denied Skeens's motion for a judgment of acquittal or, in the alternative, for a new trial. The circuit court reaffirmed that ruling in a final order entered on July 25, 2012.[1]

Jarrell's death resulting from Skeens's attack is not in dispute. Skeens asks this Court to set aside the conviction and grant him a new trial on the basis of two assignments of error.

---

[1] Skeens was represented during the trial by the Wayne County Public Defender. The final order entered on July 25, 2012, appointed the Kanawha County Public Defender as Skeens's counsel for purposes of appeal.

1

First, Skeens contends that the circuit court committed error in refusing to give the jury an instruction on voluntary manslaughter. He asserts that an instruction on voluntary manslaughter was warranted because he suffers from a mental illness which resulted in a diminished capacity to form malice, a required element of murder. Second, Skeens contends that the circuit court committed error in denying his motion for a change of venue. Skeens asserts that the motion should have been granted because of a hostile sentiment toward him generated by extensive media coverage of the case.

For the reasons stated below, this Court concludes that neither assignment of error has merit. Consequently, Skeens's conviction and sentence, as well as the final order of July 25, 2012, are affirmed.

## I. Factual Background

The facts surrounding Jarrell's death are largely undisputed.

In early December 2010, Skeens was engaged in a conversation with Howard Whaley at the BP station in Wayne, West Virginia. Skeens asked Whaley where Jarrell lived. When Whaley mentioned the Wilson's Creek area, Skeens left the station and began walking in that direction. Some time later, Jarrell was in the BP station and was told by Sherry Rowe, the station manager, that Skeens had been asking for him. Rowe told Jarrell to be careful

because Skeens was not "the same guy that he was 30 years ago." Rowe had lived with Skeens from 1999 to 2003. She indicated at trial that, during those years, Skeens frequently took pain pills and nerve pills.

On December 19, 2010, Skeens purchased two knives at the 5th Avenue Kroger store in the City of Huntington. The purchase was in cash and with the use of a Kroger Plus Card. One of the knives was found at the scene of the homicide. Later, about four or five days prior to the homicide, Skeens appeared at the residence of James Stephens in the Wilson's Creek area and asked where Jarrell lived. When Stephens told Skeens that Jarrell lived about three miles away, Skeens began walking in the direction of Jarrell's home. On December 30, 2010, an unidentified man appeared at Tammy's Florist and Gift Shop across from the BP station in the City of Wayne and asked where Jarrell lived. The employee at the shop did not know where Jarrell lived.

On the morning of December 31, 2010, the day of the homicide, Skeens was seen walking toward Jarrell's home located on Wilson's Creek. Jarrell was also seen that morning driving his gray Ford pickup truck. Around noon that day, Skeens attacked and killed Jarrell, age seventy-three, at Jarrell's home. Jarrell was stabbed forty-three times. Later that day, Jarrell's body was found by his adult son. Jarrell's pickup truck was missing. Shortly thereafter, the police arrived at the scene. The immediate investigation revealed that a

3

number of guns, and a knife, had been placed on the bed in Jarrell's bedroom.[2]  However, in addition to the truck, Jarrell's 16-gauge shotgun and hunting knife were missing.

Through the subsequent recovery of receipts and available surveillance videos, the State maintained that Skeens's movements following the homicide were as follows.  That afternoon, Skeens drove Jarrell's truck to the nearby Town of Salt Rock and purchased two lottery tickets.  Later, at 5:45 p.m., Skeens purchased some ammunition at the Wal-Mart store on Route 60 near Huntington.

Finally, at about 6:50 p.m. on December 31, 2010, State Trooper D. J. Chapman was parked in his cruiser near the Town of Lavalette when Skeens pulled up in Jarrell's pickup truck.  Skeens exited the truck, pulled off his shirt and stated twice: "I'm the man that killed Scott Jarrell."  Skeens then punched Trooper Chapman in the face while Chapman was attempting to call for back-up.  Chapman wrestled Skeens to the ground and, with assistance from a passerby, handcuffed Skeens and placed him in custody.  A search of the pickup truck

---

[2] Among the items the police recovered at Jarrell's home were a glass cup, two bowls and a spoon.  Subsequent fingerprint and DNA analysis at the State Police Forensic Laboratory connected Skeens to those items.  The State asserted that, after killing Jarrell, Skeens "fixed himself a bowl of ice cream, a bowl of chili and something to drink, and then went into the living room, sat down on the couch and had his meal."  In fact, Skeens's brief filed in this Court states:  "After committing the homicide, Mr. Skeens sat down in the Jarrell's living room and ate ice cream."

4

revealed several 16-gauge shotgun shells. Also recovered was a red sweatshirt, an analysis of which disclosed a mixture of DNA from Skeens and Jarrell.

## II. Pretrial Proceedings

In July 2011, a Wayne County grand jury returned a one count indictment charging Skeens with the murder of Jess Scott Jarrell.

At the request of defense counsel, Dr. Bobby A. Miller, a psychiatrist, performed a forensic evaluation of Skeens and found Skeens incompetent to stand trial. Although Dr. Miller determined Skeens to be psychotic, Dr. Miller also found that Skeens was malingering and exaggerating his symptoms. Dr. Miller recommended that Skeens be referred to the William R. Sharpe, Jr., Hospital in Weston, West Virginia, for competence restoration services. Nevertheless, in July 2011, a separate forensic evaluation of Skeens was conducted by Dr. Ralph S. Smith, a psychiatrist, and Dr. Rosemary L. Smith, a psychologist. They concluded that Skeens suffered from a mood disorder in conjunction with malingering and was competent to stand trial.[3]

---

[3] In addition to the determination of competency to stand trial, the report of Dr. Ralph S. Smith and Dr. Rosemary L. Smith found Skeens to be criminally responsible for his actions at the time of the homicide.

In Dr. Miller's report, the question of criminal responsibility was deferred. However, in a later report dated January 17, 2012, Dr. Miller indicated that "it is more likely than not" that Skeens was not criminally responsible for his actions at the time of

5

In August 2011, the circuit court conducted an evidentiary hearing on Skeens's competency to stand trial. Dr. Ralph S. Smith maintained that Skeens was competent. Dr. Miller, however, testified that Skeens had been hospitalized numerous times for mental problems over a ten-year period prior to the homicide and concluded that Skeens was both psychotic and malingering. Dr. Miller testified: "There's no doubt in my mind that Mr. Skeens was faking being mentally ill. There's also no doubt in my mind that he has bipolar disorder." On September 7, 2011, the circuit court entered an order concluding that while both doctors determined that Skeens was faking the severity of his psychotic symptoms, Dr. Miller found Skeens to be suffering from a bipolar disorder and, thus, unable to assist his counsel in his own defense. Consequently, the circuit court directed that Skeens be transferred to the William R. Sharpe, Jr., Hospital for observation and treatment to determine his competency to assist his counsel at trial and/or to restore his competency.

Approximately three months later, various evaluations were completed stating that Skeens was competent to stand trial. Skeens was discharged from the hospital and transferred to the Western Regional Jail. In an order entered on January 6, 2012, the circuit

---

the homicide. In a subsequent letter to defense counsel dated May 17, 2012, Dr. Miller stated that "within the limits of Mr. Skeens' willingness to cooperate in the evaluation process," it is "more likely than not" that Skeens was experiencing a bipolar episode at the time of the offense.

court set forth its ruling that, based on the evidence, Skeens was competent to stand trial.

Subsequently, Skeens filed a notice reserving the right to assert a diminished capacity defense at trial due to mental illness at the time of the homicide.

In February 2012, Skeens filed a motion for a change of venue. *See* W.Va. R. Crim. P. 21 (authorizing the transfer of proceedings to another county based on prejudice in the county of indictment), and *W.Va. Code*, 62-3-13 [1923] (authorizing a change of venue for good cause in a criminal case). Skeens alleged that, because Jarrell was well-known and well-liked in the community and the media coverage of the case was extensive, he could not obtain a fair and impartial trial in Wayne County. Subsequently, Skeens filed a document entitled "An Opinion Survey of Eligible Wayne County, WV Jurors for the Murder Trial of Clinton Douglas Skeens." Prepared at the request of Skeens's counsel by Don Richardson Associates, Charleston, West Virginia, the survey stated that a total of 201 randomly selected, eligible jurors for Skeens's upcoming trial were interviewed by telephone during the period March 21 to April 9, 2012. The survey showed:

> The events related to the alleged murder and Clinton Douglas Skeens that were reported by the local news media were known before the survey phone call by 171 or 85% of the respondents, 15% did not know about the events before the phone call. . . .

7

> Of the 171 respondents who knew about the information, 87, or 50% had formed an opinion as to the guilt or innocence of the accused before the phone call[.]   .   .   .
>
> Of the 87 respondents who had formed an opinion of the accused before the phone call, 78 or 90% had negative opinions

Nevertheless, a significant number of those surveyed indicated that they could follow the circuit court's instruction "to presume Clinton Douglas Skeens innocent until proven guilty, based solely on the evidence presented in the courtroom."

On May 7, 2012, the circuit court conducted a hearing on the motion for a change of venue. The circuit court ruled that the motion would be taken under advisement until voir dire at trial, at which time the question of prejudice against Skeens among eligible jurors would be reviewed.

### III. The Jury Trial

Jury selection began on May 22, 2012, and continued through May 23, 2012. Over that two-day period, sixty-four potential jurors were called and underwent voir dire in open court. Of those, forty-four potential jurors underwent individual voir dire in chambers, and counsel for the State and the defense were given an opportunity to ask questions.

8

Although a number of potential jurors testified in chambers that they had heard about the case through the media, primarily when the homicide was first reported in early January 2011, few of them could recall any details of the coverage.

By the end of the jury selection process, thirty-four potential jurors had been excused for cause. On June 4, 2012, the circuit court entered an order finding that "there was not widespread prejudicial publicity that would jeopardize a fair trial" and that the jury selection process was successful in empaneling qualified and impartial jurors. Accordingly, Skeens's motion for a change of venue was denied.

Skeens did not assert the defense of insanity at trial. Instead, he asserted diminished capacity, a defense expressly adopted by this Court in *State v. Joseph*, 214 W.Va. 525, 590 S.E.2d 718 (2003). Skeens maintained that, at the time of the commission of the crime charged, he suffered from a mental defect that rendered him incapable of forming the mental state required for the elements of murder. Accordingly, prior to the presentation of evidence to the jury by the defense, the circuit court heard the testimony of Skeens's forensic psychiatrist, Dr. Bobby A. Miller, in camera. Dr. Miller testified that, although Skeens had the ability to develop intent and premeditation, and engage in acts done maliciously, the intent Skeens had at the time of the homicide was irrational, based upon his bipolar or

9

psychotic condition.[4]  The circuit court ruled that Dr. Miller would be allowed to testify before the jury.

Skeens testified at trial and told the jury that he once played football for Jarrell and that Jarrell had always treated him with respect.  Skeens testified that, although he had not seen Jarrell in several years, his mental illness caused him to conclude that Jarrell was going to kill members of Skeens's family.  Skeens further stated that he went to the Kroger store because he needed a knife to kill Jarrell.  Skeens only remembered stabbing Jarrell two or three times and asserted that Jarrell "never suffered a lot of pain."  Finally, although Skeens denied that he told Trooper Chapman that he killed Jarrell and denied that he punched Chapman, Skeens testified that he killed Jarrell.

Dr. Miller then testified and stated that Skeens had the ability to form intent, premeditation, deliberation and malice.  However, Dr. Miller stated, again, that the intent Skeens had at the time of the homicide was irrational, based upon his bipolar or psychotic condition.  While acknowledging that Skeens had a history of malingering or exaggerating

---

[4] During his in camera testimony, Dr. Miller noted that Skeens had been uncooperative during one of the forensic evaluations.  Skeens indicated that he would not participate in the evaluation if Dr. Miller was planning to appear in the case in support of an insanity defense.  Later, in his January 17, 2012, report, Dr. Miller determined that Skeens had the capacity to waive his right to an insanity defense.  *See* n. 3, *supra*.

10

the extent of his mental illness, Dr. Miller testified that Skeens was "both psychotic and malingering."

The trial was not bifurcated into a guilt phase and a penalty phase. During instructions to the jury, the circuit court addressed Skeens's diminished capacity defense as follows:

> The existence of a mental illness alone is not sufficient to trigger a diminished capacity defense. It must be shown by psychiatric testimony that some type of mental illness rendered the Defendant incapable of forming the specific intent alleged in the crime charged.

The circuit court then told the jury that, although malice was an element of both murder of the first and second degrees, murder of the first degree required the additional elements of deliberation and premeditation.[5]

---

[5] In *State v. Horn*, 232 W.Va. 32, 750 S.E.2d 248, 257 (2013), this Court reaffirmed that *W.Va. Code*, 61-2-1 [1991], describes three broad categories of homicide constituting murder of the first degree: (1) murder by poison, lying in wait, imprisonment, starving; (2) by any willful, deliberate and premeditated killing; and (3) in the commission of, or attempt to commit, certain enumerated crimes. In this case, the second category, requiring deliberation and premeditation, was alleged by the State. Thus, we note the following observation found in *State v. Hatfield*, 169 W.Va. 191, 198, 286 S.E.2d 402, 407-08 (1982): "It is clear, however, that the intent to kill or malice is a required element of both first and second degree murder but the distinguishing feature for first degree murder is the existence of premeditation and deliberation." *Accord State v. Davis*, 220 W.Va. 590, 594 n. 6, 648 S.E.2d 354, 358 n. 6 (2007).

11

Following the reading of instructions and argument of counsel, the case was submitted to the jury. The jury was presented with four options: (1) guilty of murder of the first degree, without a recommendation of mercy; (2) guilty of murder of the first degree, with a recommendation of mercy; (3) guilty of murder of the second degree; and (4) not guilty. The jury found Skeens guilty of murder of the first degree, without a recommendation of mercy. The circuit court sentenced Skeens to the penitentiary for a term of life, without the possibility of parole.

The circuit court subsequently denied Skeens's motion for a judgment of acquittal or, in the alternative, for a new trial. *See* W.Va. R. Crim. P. 29 and 33 (addressing motions for judgment of acquittal and for a new trial).[6] The circuit court confirmed that ruling in its final order entered on July 25, 2012. This appeal followed.

---

[6] Skeens's post-trial motion for a judgment of acquittal or, in the alternative, for a new trial, was a renewal of the oral motion he made at the close of the State's case-in-chief. Denying that motion at trial, the circuit court stated:

> . . . [T]he Defendant in this case was looking for the victim, for whatever reason, but for several weeks prior to the actual crime - - that, establishing elements of premeditation.
>
> Also, the purchase of weapons, and I believe that was maybe 10 days or so prior to the killing. That establishes, in my opinion, the element of deliberation.
>
> Maliciousness was shown from the brutality of the crime, itself.

12

## IV. Standards of Review

The standard of review pertaining to the denial of Skeens's motion for a judgment of acquittal or, in the alternative, for a new trial is found in syllabus point 3 of *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000):

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

*Accord* syl. pt. 1, *State v. Horn*, *supra*.

Additional standards of review directly relating to the two assignments of error raised by Skeens are set forth below.

## V. Discussion

### A.
### Instruction on Voluntary Manslaughter

Skeens first assigns as error the refusal of the circuit court to instruct the jury on voluntary manslaughter. Skeens contends that Dr. Miller's testimony concerning Skeens's mental illness was sufficient to create a reasonable doubt on the question of malice. Therefore, had the instruction been given, the jury could have found Skeens guilty of voluntary manslaughter, rather than having been presented with the limited options of a

13

murder verdict or a verdict of not guilty. Skeens asserts that the refusal to give the instruction denied his right to a fair trial. The circuit court was of the opinion, however, that an instruction on voluntary manslaughter was not warranted by the evidence.

In *State v. Jones*, 174 W.Va. 700, 329 S.E.2d 65 (1985), this Court held in syllabus point 1:

> The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense. *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982).

*Accord* syl. pt. 3, *State v. Wilkerson*, 230 W.Va. 366, 738 S.E.2d 32 (2013).

It is well settled that voluntary manslaughter, a felony under *W.Va. Code*, 61-2-4 [1994], is a lesser included offense of murder. *See State v. McGuire*, 200 W.Va. 823, 834, 490 S.E.2d 912, 923 (1997); *State v. Guthrie*, 194 W.Va. 657, 671, 461 S.E.2d 163, 177 (1995). In this case, the inquiry, therefore, is a factual one.[7]

---

[7] In the past, the resolution of facts in that context has been considered by this Court along various avenues of discussion, all to the same end, *i.e.*, whether the evidence, at trial, warranted the giving of an instruction on a lesser included offense. In *State v.*

In *State v. Joseph*, *supra*, this Court addressed the defense or, more accurately, the rule of evidence known as diminished capacity. That case involved an altercation during which the defendant grabbed a pistol, shot the victim, and then backed over the victim in a vehicle in a hasty attempt to leave the scene. At trial, the defendant was convicted of murder of the first degree, with mercy. Several years prior to the incident, the defendant suffered a brain injury in a motorcycle accident. In *Joseph*, the defendant asserted error in the exclusion of expert testimony offered to show diminished capacity resulting from the brain injury. According to the defendant, his diminished capacity prevented him from forming the requisite mental state for the commission of first or second degree murder. The defendant's forensic psychologist would have testified that, although the defendant was capable of forming premeditation and malice, "the rapidity of the situation" prevented the defendant from forming those elements at the time of the homicide.

---

*Allen*, 131 W.Va. 667, 49 S.E.2d 847 (1948), for example, it was observed that, "except in extreme cases, where no possible verdict other than murder of first or second degree or an acquittal, could be justified, and where there is appreciable evidence of any other grade of homicide," the jury should be given an instruction defining manslaughter. 131 W.Va. at 677, 49 S.E.2d at 852. Stated somewhat differently, syllabus point 1 of *State v. Stephenson*, 114 W.Va. 458, 172 S.E. 533 (1933), holds: "In a trial for murder, where the evidence does not admit of any other conclusion than of murder in the first degree, an instruction on a lesser grade of the offense charged, need not be granted."

This Court concluded, in *Joseph*, that the evidence of the forensic psychologist was sufficient for jury consideration and that, therefore, the defendant was entitled to a new trial. Expressly adopting the concept of diminished capacity in regard to criminal cases, syllabus point 3, of *Joseph*, holds:

> The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense.

*Accord* syl. pt. 3, *State v. Ferguson*, 222 W.Va. 73, 662 S.E.2d 515 (2008) (The trial court committed error in striking the testimony of a psychologist called by the defendant in support of his diminished capacity defense.).[8]

In so holding, however, this Court, in *Joseph*, confirmed the principle that the admissibility of testimony of an expert witness is a matter within the sound discretion of the circuit court. Moreover, in *Joseph*, this Court, citing *State v. Simmons*, 172 W.Va. 590, 600,

---

[8] *See generally* Vitauts M. Gulbis, Annotation, *Admissibility of Expert Testimony as to Whether Accused Had Specific Intent Necessary for Conviction*, 16 A.L.R.4th 666 (1982); C. T. Drechsler, Annotation, *Mental or Emotional Condition as Diminishing Responsibility for Crime*, 22 A.L.R.3d 1228 (1968).

309 S.E.2d 89, 99 (1983), noted: "The existence of a mental illness is not alone sufficient to trigger a diminished capacity defense." It must be shown by expert testimony that the mental illness "rendered the defendant incapable of forming the specific intent elements." *Joseph*, 214 W.Va. at 532, 590 S.E.2d at 725.

In the case now before us, the circuit court, as in *Joseph*, conducted an in camera hearing and heard the testimony of Skeens's forensic psychiatrist, Dr. Bobby A. Miller. Unlike *Joseph*, however, the circuit court permitted Dr. Miller to testify at trial and gave the jury an instruction on diminished capacity.

The circuit court had misgivings about allowing Dr. Miller to testify. Of concern was Dr. Miller's prior letter of May 17, 2012, to defense counsel which addressed Skeens's criminal responsibility. The letter, consisting of a single paragraph of less than five lines, stated that "within the limits of Mr. Skeens's willingness to cooperate in the evaluation process," it is "more likely than not" that Skeens was experiencing a bipolar episode at the time of the offense. Suggesting that the letter was equivocal, the circuit court questioned the letter's sufficiency as a basis for Dr. Miller's testimony at trial. Dr. Miller explained during the in camera hearing that Skeens's lack of cooperation was only to the extent that Skeens did not want an insanity defense to be pursued. Dr. Miller then stated that, as a psychiatrist,

17

he would have felt "more comfortable discussing straight up insanity."[9] *Nevertheless, unlike Joseph, in this case it was not until the conclusion of the trial, which included Dr. Miller's testimony, that the circuit court ruled that the evidence was insufficient to instruct the jury on voluntary manslaughter.*

During the trial, Dr. Miller testified that Skeens had the ability to form intent, premeditation, deliberation and malice. However, Dr. Miller stated that the intent Skeens had at the time of the homicide was irrational, based upon his mental condition. Moreover, Dr. Miller testified that Skeens was "both psychotic and malingering."

Though not dispositive, a review of Dr. Miller's testimony in the context of other evidence presented to the jury is helpful. During rebuttal, the State called Dr. Thomas Hamilton, an emergency room physician at Cabell Huntington Hospital. Dr. Hamilton treated Skeens in the early morning hours after the homicide for shoulder and rib pain sustained in the scuffle with Trooper Chapman. Dr. Hamilton testified that Skeens did not

---

[9] During the in camera hearing, the following exchange occurred:

The Court: So, in doing that, I think [Skeens] forecloses on an insanity defense. So, now you're coming in here and asked to try to somehow back door, or through the basement door, give the jury information about a diminished capacity that you don't believe really exists.

Dr. Miller: Well, I would not negate intent. I would talk about the irrational nature of the intent.

18

exhibit any behavior which caused him to believe that a psychiatric or psychological consult was warranted.

The State also called Dr. Ralph S. Smith, a forensic psychiatrist. Concluding from his evaluation that Skeens was criminally responsible at the time of the homicide, Dr. Smith testified: "He just did not appear psychotic to me. Therefore, we had these specialized tests for malingering or faking, which he showed that he was faking a mental illness." Moreover, although Skeens, at trial, only remembered stabbing Jarrell two or three times, Dr. Smith testified that Skeens told him that he stabbed Jarrell over forty times. Dr. Smith also testified that Skeens had a history of substance abuse.

Also of significance is the evidence that, after Jarrell was killed, Skeens took Jarrell's Ford pickup truck,[10] drove to Salt Rock to purchase lottery tickets and then drove to a Wal-Mart store to purchase ammunition. Soon after, Skeens drove the truck to Lavalette where he confronted Trooper Chapman.

In syllabus point 17 of *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966), this Court held: "It is not necessary to show motive in case of a homicide in order to warrant a verdict of murder." Here, the jury was presented with four possible verdicts: (1) guilty of

---

[10] In addition, Skeens allegedly took Jarrell's 16-gauge shotgun and hunting knife.

19

murder of the first degree, without a recommendation of mercy; (2) guilty of murder of the first degree, with a recommendation of mercy; (3) guilty of murder of the second degree; and (4) not guilty. Bypassing the less egregious options, the jury found Skeens guilty of murder of the first degree, without a recommendation of mercy.

Syllabus point 1 of *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996), states:

As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*.

*Accord* syl. pt. 1, *State v. Thompson*, 220 W.Va. 246, 647 S.E.2d 526 (2007). *See also* syl. pt. 4, *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971) ("Instructions must be based upon the evidence and an instruction which is not supported by evidence should not be given.").

This Court has reviewed the evidence submitted by the defense at trial and concludes that Skeens's request for an instruction on voluntary manslaughter was a matter properly within the discretion of the circuit court. Following the in camera hearing conducted pursuant to *State v. Joseph*, *supra*, the circuit court, with some hesitation, permitted Dr. Miller to testify in support of Skeens's assertion of diminished capacity. After the close of the evidence, the circuit court concluded that an instruction on voluntary manslaughter was

20

not warranted by the evidence. This Court is of the opinion that the refusal to give that instruction was "protected by the parameters of sound discretion." *State v. Shingleton*, 222 W.Va. 647, 652, 671 S.E.2d 478, 483 (2008).

Accordingly, this assignment of error is without merit.

## B.
### The Motion for a Change of Venue

In this assignment of error, Skeens contends that the circuit court abused its discretion in denying his motion for a change of venue. Skeens asserts that the motion should have been granted because of a widespread, hostile sentiment toward him in Wayne County. According to Skeens, the hostile sentiment was generated by extensive media coverage of the case resulting from the fact that Jarrell was a well-known and well-liked member of the community.[11] Skeens, thus, alleges a denial of his right to a fair and impartial trial.

In support of the motion, Skeens filed a telephone survey of 201 randomly selected, eligible Wayne County jurors. The survey showed that 171 of the respondents knew about

---

[11] Skeens, however, acknowledges in his brief: "Unfortunately, defense counsel failed to submit for the record the news media articles in support of the motion for change of venue. Current counsel's motion to supplement the record with these articles was denied by this Court."

the case and that, of that number, 87 had formed an opinion as to guilt or innocence. Of the

87 respondents who had formed an opinion, 78 had formed a negative opinion toward the

accused. Nevertheless, a significant number of those surveyed indicated that they could

follow the circuit court's instruction "to presume Clinton Douglas Skeens innocent until

proven guilty, based solely on the evidence presented in the courtroom." The circuit court

conducted a hearing on the motion for a change of venue and took the motion under

advisement until completion of the voir dire process at trial. After voir dire was completed,

the motion was denied.

A defendant in a criminal case has a fundamental right to an impartial, objective jury

that, without bias and prejudice, can render a verdict solely on the evidence and under the

instructions of the trial court. An effective voir dire process is necessary to secure that right.

Syllabus point 3 of *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978), states:

> Jurors who on *voir dire* of the panel indicate possible prejudice should
> be excused, or should be questioned individually either by the court or by
> counsel to precisely determine whether they entertain bias or prejudice for or
> against either party.

*Accord* syl., *State v. Deaner*, 175 W.Va. 489, 334 S.E.2d 627 (1985). *See* W.Va. R. Crim.

P. 24.(a) (providing for the examination of prospective jurors). In some cases, a change of

venue is required to provide the accused a fair trial.

22

The principles associated with a motion for a change of venue are well settled. Several of those principles are set forth in syllabus point 2 of *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946):

> To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests upon defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.

*Accord* syl. pt. 6, *State v. Black*, 227 W.Va. 297, 708 S.E.2d 491 (2010).

In this case, jury selection began on May 22, 2012, and continued through May 23, 2012. Over that two-day period, sixty-four potential jurors were called and underwent voir dire in open court. Of that number, forty-four potential jurors were questioned individually in chambers, and counsel for the State and the defense were given an opportunity to ask questions.

By the end of the voir dire process, thirty-four potential jurors had been excused for cause. The circuit court subsequently entered an order finding that "there was not widespread prejudicial publicity that would jeopardize a fair trial" and that the jury selection

23

process was successful in empaneling qualified and impartial jurors. Skeens's motion for a change of venue was, therefore, denied.

The circuit court acted with care and thoroughness in ruling on Skeens's motion for a change of venue. Following the pretrial hearing on the motion, the circuit court devoted two full days to voir dire, which included detailed questions about media exposure and other knowledge concerning the case. The questioning took place in open court and in chambers. Both counsel for the State and the defense participated. The remaining, potential jurors were again questioned about possible knowledge of the case immediately prior to the State's opening statement.

None of the potential jurors called for jury duty in Skeens's trial had been contacted for the survey filed in support of Skeens's motion. Nevertheless, many of the potential jurors expressed awareness of the case gained through local news reports. Most of that exposure, however, occurred shortly after the homicide took place on December 31, 2010, nearly a year and a half prior, and few potential jurors could recall any details of the coverage. Moreover, a review of the May 22 and May 23, 2012, transcripts reveals that the questioning on voir dire was extensive, particularly the questioning of potential jurors by the circuit court and defense counsel in chambers.

Not all of the strikes for cause were due to media exposure. One juror was dismissed for cause because his uncle was a State Trooper, and another juror was dismissed because of a criminal conviction. Several of the potential jurors questioned, in chambers, revealed that, although they were aware of media reports about the case, they knew a witness or a police officer involved in the case, had a connection to Wayne High School, or had a connection to a prior, unrelated criminal proceeding.

Syllabus point 3 of *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994), states:

> One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

*Accord* syl. pt. 4, *State v. Blevins*, 231 W.Va. 135, 744 S.E.2d 245 (2013). *See also* syl. pt. 1, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982) ("Widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial.").

The approach of the circuit court was legally sound, and its finding that the jury selection process was successful in empaneling qualified and impartial jurors is supported

by the evidence.[12]  Accordingly, the denial of Skeens's motion for a change of venue was within the circuit court's discretion, and this assignment of error is without merit.

## VI. Conclusion

For the reasons stated above, Skeens's conviction and sentence, as well as the circuit court's final order of July 25, 2012, are affirmed.

Affirmed.

---

[12] *See State v. Toney*, 98 W.Va. 236, 242, 127 S.E. 35, 37 (1925) ("The appearance of the juror, his bearing, and manner, are often of great consequence in interpreting his answers, and for that reason in any doubtful case the decision of the trial court as to his eligibility must control.").